IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No.: 5:21-CV-338

| | |
|---|---|
| KIMBERLY ERWAY, *as Parent of Minor Child Jamii Erway*, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES TRANSPORTATION SECURITY ADMINISTRATION, UNITED STATES OF AMERICA, and JANE DOE, *an Employee of the United States Transportation Security Administration*, <br><br> Defendants. | **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

1) Plaintiff Kimberly Erway, and her minor child Jamii Erway[1], were ticketed passengers attempting to travel through Raleigh-Durham International Airport ("RDU") on May 1st, 2019, requiring them to submit to a security screening by Defendant U.S. Transportation Security Administration ("TSA").

2) Jamii Erway entered a TSA body scanner, as directed, and a "false positive" alert indicated that the scanner detected an anomaly on her groin.

3) The TSA procedure for resolving such anomalies is to conduct a brief pat-down search.

4) Notwithstanding, TSA screener Jane Doe ("DOE") told Jamii that she would have to submit to a strip search in a private room whereby Doe would *inspect the child's genitals*, and advised Jamii that she was not free to leave until she submitted to such a search, in violation

---

[1] Plaintiff waives the right to protection of the child's name pursuant to Fed. R. Civ. P. 5.2(h). Jamii is seventeen years old at time of filing.

of TSA policy, the Fourth Amendment, and state law rights of Jamii., and the boundaries of civil and decent society.

## JURY TRIAL

5) Plaintiffs[2] demand a trial by jury on all issues so triable.

## PARTIES

6) Kimberly Erway is a natural person domiciled in North Carolina, and is the mother and legal guardian of Jamii Erway.

7) Jamii Erway is the minor child of Kimberly Erway and lives with her in North Carolina.

8) Defendant U.S. Transportation Security Administration is a sub-agency of the U.S. Department of Homeland Security and is sued here for injunctive relief only.

9) Defendant United States of America is the sovereign nation and is the proper defendant for torts alleged through the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*.

10) Defendant Jane Doe is a Transportation Security Officer with the U.S. Transportation Security Administration and is sued here in her individual capacity pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). DOE's true name will be added to an amended complaint once identified.

## JURISDICTION & VENUE

11) Personal jurisdiction is proper because all defendants work (and, upon belief, the individual defendant resides) within the State of North Carolina.

12) Subject matter jurisdiction is proper over the constitutional claims because they arise under federal law. *See* 28 U.S.C. § 1331.

---

[2] References to "Plaintiffs" in the plural refer to both Jamii and her mother.

13) Subject matter jurisdiction is proper over the tort claims brought against United States of America pursuant the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*.

14) Venue is proper because the incident that gave rise to the complaint occurred within the Eastern District of North Carolina.

## ALLEGATIONS OF FACT

15) On May 1st, 2019, Plaintiffs arrived at RDU.

16) Plaintiffs possessed valid boarding passes for a flight departing RDU later that day.

17) Plaintiffs approached the TSA screening line, as was required of them as a prerequisite to boarding their flight, and presented valid photo identification and the boarding passes.

18) Jamii was directed into a body scanner for screening.

19) A TSA body scanner uses radiation to create an image of the passenger's body and automatically inspects that image for "anomalies" – things that are not parts of the human body and could possibly be a threat item such as a bomb or weapon.

20) The body scanner indicated an anomaly was present on Jamii's groin area.

21) This was a "false-positive" – that is, Jamii was not in possession of any prohibited items (or any items at all, other than normal clothing) in her groin area.

22) False-positives on body scanners are a common occurrence; upon information and belief, at least 20% of TSA body scans indicate an anomaly even though the traveler is not secreting any items on their person.

23) False-positives can be caused by wearing certain types of clothing, by sweating, by body deformities, by moving during a scan, by operator error, or many other reasons.

24) Jamii is a transgender person, which means that Jamii lives as a different gender from the biological sex she was born with.

25) In particular, Jamii was assigned male at birth and now lives as a female

26) When a passenger is to be screened by body scanner, a TSA employee operating the scanner must press a button indicating to the scanner whether the passenger is "male" or "female."

27) This lets the body scanner know what to expect – for example, if "female" is pushed, the body scanner does not expect to find external genitalia and will alarm if it does.

28) Jamii, like all transgender individuals, is more likely to encounter false-positives because although she appears female, she possesses external genitalia and thus will trigger a false positive unless the screener presses male[3].

29) Thus, Jamii frequently has to deal with false positives when she flies.

30) TSA regularly receives complaints from transgender individuals regarding this issue, and upon information and belief, transgender individuals are subject to false-positives due to misidentification at TSA checkpoints on a daily basis.

31) After being scanned and generating a false positive on the date in question, Jamii advised the body scanner operator that she was transgender and the false positive could be resolved by re-scanning and pressing the other button.

32) The body scanner operator declined to re-scan Jamii and instead called over a supervisor.

33) Defendant DOE arrived and the body scanner operator explained the groin anomaly and that Jamii had indicated that she is transgender.

---

[3] Could Jamii avoid these troubles by advising the scanner operator of the correct button to press? It is, unfortunately, not that simple. For one thing, body scanner operators are often unwilling to take instructions from passengers. But, even if they were, the male/female button causes other problems. For example, if the operator presses "female," the scanner will ignore a small item located in the center of the traveler's back, in order to accommodate the fact that women often have clasps for a bra strap there but men do not. Thus, if one has external genitals and is wearing a bra, there is no button that will accommodate their situation.

34) TSA procedure for resolving body scanner anomalies in order to determine if they are a false positive or a true threat is to conduct a brief pat-down search right next to the body scanner.

35) TSA procedure explicitly prohibits checkpoint screeners (including all levels of supervisors) from conducting strip-searches and from making direct contact with the genitals of travelers.

36) Notwithstanding, and for reasons still unknown to Plaintiffs, DOE advised Jamii that she would need to accompany her to a private room, expose herself, and allow DOE to "feel up in there," *i.e.*, touch her genitals.

37) Jamii verbally protested the search proposed by DOE.

38) DOE advised Jamii that she would not be allowed to leave the checkpoint until she complied.

39) Jamii understood that she was not free to leave at this point.

40) Kimberly, seeing the interaction from several feet away, asked DOE what was going on.

41) DOE told Kimberly that she should "mind her business."

42) Kimberly told DOE that Jamii was her child and therefore she had the right to be involved in the conversation.

43) DOE then directed Kimberly to force Jamii to submit to the strip-search.

44) Kimberly refused.

45) Throughout this time, Jamii experienced severe emotional distress, including symptoms of panic, anxiety, fear, racing heart, shortness of breath, uncontrollable shaking, and nausea.

46) DOE then summoned a police officer.

47) A police officer, as well as TSA management arrived.

48) The police officer advised that he would not be assisting in the detention of Jamii.

49) Without further objection of any TSA staff, Jamii and Kimberly left the airport, rented a car, and drove over 600 miles to return home[4].

50) Plaintiffs attempted to present an FTCA claim to TSA on January 11th, 2020, alleging damages to $1,000,000 stemming from the above facts.

51) The Court, in a previous case regarding the incident described in this complaint, ruled that the presentation was defective and dismissed that case without prejudice to renewing the FTCA claim once properly presented. See Erway v. U.S., 5:20-CV-141 (E.D.N.C., October 29th, 2020) (Myers, J.).

52) Plaintiffs re-presented their FTCA claim to TSA on December 14th, 2020.

53) TSA did not respond to the claim within the 6-month presentment window, and thus her administrative claim requirements have been exhausted.

54) Jamii continues to experience symptoms of severe emotional distress, including symptoms of panic, anxiety, fear, racing heart, shortness of breath, uncontrollable shaking, and nausea, whenever reminded of the incident described herein and has been unable to fly since.

55) Before the incident described here, Jamii typically flew by commercial aircraft several times per year.

56) Jamii would like to be able to fly again, and an order from the Court that would ensure that Jamii would never encounter the situation described would assist in reducing the recurring emotional distress that currently prevents her from doing so.

---

[4] At the time of the incident, Plaintiffs lived in Rochester, New York.

# CLAIMS FOR RELIEF

## Count 1 – Fourth Amendment to the U.S. Constitution
### *Unreasonable Seizure (Against Jane Doe) Pursuant to* Bivens

57) The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures," and in general, a warrant or an exception to the warrant requirement is required before the government may conduct a search without the consent of the searched.

58) The "administrative search doctrine" allows the government to conduct some level of limited warrantless searches under the theory that the searches are aimed at a public safety concern rather than uncovering evidence of criminality (or, in the alternative, under the theory that by presenting one's self at the TSA checkpoint, one is consenting to the search).

59) However, the administrative search doctrine allows only for extremely limited, narrowly-tailored searches in furtherance of a regulatory scheme.

60) No court has ever approved a strip search under the administrative search doctrine.

61) No regulatory scheme required or allowed a strip search in this instance.

62) TSA policy expressly forbids strip searches by passenger screening employees.

63) The search proposed by DOE was therefore unauthorized by law and detaining Jamii for the purpose of conducting such a search was therefore unauthorized by law[5].

---

[5] Even if DOE had proposed a lawful search: a) TSA checkpoint employees are not law enforcement officers and have no authority to detain anyone, and b) refusing a TSA search is not a criminal matter and thus not even law enforcement may detain an individual who refuses. The correct procedure when a traveler refuses a legitimate TSA search is to inform the traveler that they may not enter the secure area and to allow them to leave the airport. Thus, DOE is liable for seizing Jamii whether or not the search she proposed was unlawful. The unlawful nature of the search simply makes it more egregious.

64) A reasonable person in Jamii's circumstances, having been told by a uniformed officer of the United States of America that they may not leave, would have understood that they were not free to go.

65) DOE intentionally detained Jamii.

66) Plaintiffs did not consent to confinement.

67) Plaintiffs were conscious of DOE's detention of Jamii.

68) Jamii's constitutional right to be free from unlawful seizure was thus knowingly and intentionally violated.

69) Defendant DOE is thus liable for damages stemming from her unconstitutional seizure of Jamii's person.

## Count 2 – Intentional Infliction of Emotional Distress
### *via the Federal Tort Claims Act (Against United States of America)*

70) A strip search is a universally humiliating experience, the offensive nature of which is immediately apparent to any human.

71) The mere threat of forcing one to submit to a strip search and manual manipulation of one's genitals, as DOE made to Jamii, when one wears the uniform of the United States of America and invokes that authority, *and especially when the victim is a child*, is sufficient to cause severe emotional distress in ordinary people.

72) DOE did, in fact, cause severe emotional distress in Jamii, as described *supra*.

73) Any person in DOE's position would know that making such a demand would foreseeably cause severe emotional distress.

74) DOE therefore intentionally or recklessly caused the severe emotional distress experienced by Jamii.

75) Sufficient notice was presented to, and denied by, United States of America as required by the Federal Tort Claims Act.

76) Defendant United States of America is thus liable for damages stemming from intentional infliction of emotional distress via the Federal Tort Claims Act.

<strong><u>Count 3 – Fourth Amendment to the U.S. Constitution</u></strong><br><em><u>Injunctive Relief (Against U.S. Transportation Security Administration)</u></em>

77) The Fourth Amendment protects the people against "unreasonable searches and seizures."

78) Jamii, as a transgendered person, faces a substantially elevated likelihood of alarming the body scanner each time she passes through such a machine.

79) Thus, Jamii also faces an increased risk that she will encounter additional screeners who may similarly injury her if they are not properly trained as to how to deal with such an "anomaly."

80) The U.S. Transportation Security Administration has a duty to ensure that their employees are acting in accordance with the law.

81) The search that Jamii encountered violated the law because it was an unauthorized and Fourth Amendment unreasonable search.

82) TSA has enacted policies that, if followed, would have prevented the constitutional (as well as common-law) injury incurred by Plaintiffs; to wit: a policy prohibiting strip searches by checkpoint screeners.

83) However, TSA has failed to train and supervise its employees such that these policies are effected.

84) Plaintiffs do not challenge these policies and do not seek to modify them in any way.

85) Instead, Plaintiffs seek an order compelling TSA to *enforce* these policies, *e.g.*, via additional training, improved employment screening, better monitoring, *etc*.

86) Plaintiff thus prays for an injunction ordering TSA to take the actions necessary to enforce its policies to avoid future Fourth Amendment injury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

i. Actual damages for loss of liberty, unconstitutional search, and any emotional damages stemming therefrom in an amount to be determined by a jury.

ii. Punitive damages in an amount to be determined by a jury.

iii. An injunction, to be determined by the Court, to prevent the reoccurrence of the injuries described herein.

iv. Cost of the action.

v. Reasonable attorney's fees.

vi. Any other such relief as the Court deems appropriate.

**SIGNATURE PAGE FOLLOWS**

Respectfully submitted, this the 23rd day of August, 2021.

BY: /s/ Jonathan Corbett
JONATHAN CORBETT
CA Bar No. 325608
THE LAW OFFICE OF JONATHAN CORBETT, ESQ.
958 N. Western Ave. #765
Hollywood, CA 90029
jon@corbettrights.com
T: 310.684.3870
F: 310.684.3870

*Counsel for Plaintiff*

BY: /s/ Matthew R. Gambale
MATTHEW R. GAMBALE
N.C. Bar No. 43359
OSBORN GAMBALE BECKLEY & BUDD PLLC
721 W. Morgan Street
Raleigh, North Carolina 27603
matt@counselcarolina.com
T: 919.373.6422
F: 919.578.3733

*Local Civil Rule 83.1(d) Counsel for Plaintiff*