IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:21-CV-338-M

|  |  |  |
|---|---|---|
| KIMBERLY ERWAY, as Parent of Minor Child J. E.[1], | ) ) ) ) | |
| PLAINTIFF, | ) ) | DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION AND FAILURE TO STATE A CLAIM |
| V. | ) ) | |
| UNITED STATES TRANSPORTATION SECURITY ADMINISTRATION, UNITED STATES OF AMERICA, and JANE DOE, an Employee of the United States Transportation Security Administration, | ) ) ) ) ) ) ) | |
| DEFENDANTS. | ) ) ) | |

This is Plaintiff's second action against the same defendants arising from the same events challenging the alleged conduct of a Transportation Security Administration (TSA) employee during a security screening at an airport checkpoint. The prior suit was dismissed for lack of subject matter jurisdiction and failure to state a claim. See Erway v. TSA, et al., No. 5:20-cv-141-M (Oct. 29, 2020 E.D.N.C.), [D.E. 17].

Plaintiff again brings suit as the parent of a transgender minor, "J.E." seeking damages under the Federal Tort Claims Act (FTCA) for intentional infliction of emotional distress (IIED) allegedly committed against J.E. Plaintiff also seeks indeterminate injunctive relief against TSA "to avoid future Fourth Amendment injury" to J.E. Last, Plaintiff seeks to

---

[1] The minor child's initials are used in compliance with Rule 5.2(a)(3). See Richardson v. United States, No. 5:08-cv-620-D, (DE 29) (E.D.N.C. Mar. 1, 2010).

1

hold an unnamed TSA employee[2] personally liable for money damages under <u>Bivens</u>[3] for alleged violation of J.E.'s Fourth Amendment rights.

Plaintiff's claims again fail. First, the IIED claim fails because the FTCA generally does not waive the United States' sovereign immunity for claims based on the intentional tortious conduct of federal employees, and the exception for certain torts committed by investigative or law enforcement officers does not apply to TSA screeners. The Court therefore lacks subject-matter jurisdiction over the IIED claim and it should be dismissed pursuant to Rule 12(b)(1). Fed. R. Civ. P. 12(b)(1).

Second, Erway lacks standing to assert prospective injunctive relief against TSA because she has not plausibly alleged that J. E. is in immediate danger of sustaining a direct injury in the future. The request for an injunction therefore should be dismissed for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

Third, even if standing existed, Erway's request for injunctive relief in this context necessarily entails reviewing an order of the TSA Administrator, and such review can only be obtained in an appropriate Court of Appeals under 49 U.S.C. § 46110. This Court therefore lacks subject-matter jurisdiction to adjudicate Erway's request for an injunction against TSA and it should be dismissed pursuant to Rule 12(b)(1). Fed. R. Civ. P. 12(b)(1).

Fourth, even if the Court finds jurisdiction over the request for an injunction, the request fails because the Complaint does not state a Fourth Amendment claim upon which relief can be granted against TSA. Federal agencies, such as TSA, are not liable for intentional unconstitutional conduct committed by an individual employee. The request for an injunction should be dismissed for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

---

[2] DOJ written authorization to represent individual defendants in <u>Bivens</u> actions is required. The USAO-EDNC does not have authority to represent the unserved Defendant Doe in this case. Accordingly, this motion is filed only on behalf of TSA and the United States.
[3] <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).

# STATUTORY FRAMEWORK

A.     The Federal Tort Claims Act

The FTCA, enacted by Congress in 1946, waives the United States' sovereign immunity for money damages for certain torts committed by federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b). Under the intentional tort exception, however, sovereign immunity is not waived for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." Id. § 2680(h); see also Millbrook v. United States, 569 U.S. 50, 52 (2013).

In 1974, Congress—acting in response to a series of "no knock" raids conducted by federal narcotics officers—enacted a statutory exception to the intentional tort exception. See Pub. L. No. 93-253, § 2, 88 Stat. 50 (1974); Pellegrino v. United States, 937 F.3d 164, 194 (3d Cir. 2019) (Krause, J., dissenting) (discussing legislative history). That exception, commonly referred to as "the law enforcement proviso," waives immunity for claims arising out of "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" that are committed by "investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h). The statute defines an "investigative or law enforcement officer" to mean "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." Id.

B.     TSA and the Aviation and Transportation Security Act

The Aviation and Transportation Security Act (ATSA), enacted after the terrorist attacks of September 11, 2001, created the TSA and charged it with ensuring transportation security, including civil aviation security. See Pub. L. No. 107-71, 115 Stat. 597 (2001). As relevant here, Congress charged the TSA Administrator with "provid[ing] for the screening of all passengers and property" on commercial passenger aircraft. 49 U.S.C. § 44901(a); see

3

also id. § 114(e)(1). To carry out this duty, the TSA Administrator is directed to "develop standards for the hiring and retention of security screening personnel," "train and test security screening personnel," and "be responsible for hiring and training personnel to provide security screening." Id. § 114(e)(2)–(4).

TSA screeners "carry out administrative searches" at airport security checkpoints to search for prohibited items on the person or property of air passengers prior to boarding. Vanderklok v. United States, 868 F.3d 189, 208–09 (3d Cir. 2017). Although TSA screeners are called "Transportation Security Officers" and wear badges as part of their uniforms, they do not have the power to carry firearms, make arrests, or seize evidence. Declaration of Beth G. Walker (Walker Decl.), ¶¶ 6, 9.[4] They do not have any criminal law enforcement powers, nor do they perform any criminal or civil law enforcement function. Id., ¶¶ 6–14; see also Tobey v. Napolitano, 808 F. Supp. 2d 830, 850 (E.D. Va. 2011) (noting that TSA screeners are not law enforcement officers), aff'd, 706 F.3d 379 (4th Cir. 2013). Their highly circumscribed—but vital—role is to prevent items from being taken on commercial aircraft that could compromise the safety of passengers and crew and the public at large. See United States v. Aukai, 497 F.3d 955, 960 (9th Cir. 2007) (en banc). If screeners encounter a situation that calls for criminal investigative or enforcement activity, TSA directs that they request assistance from law enforcement personnel, who "will determine whether to take action under State or local laws." Civil Aviation Security Rules, 67 Fed. Reg. 8,340, 8,344 (Feb. 22, 2002); see also Walker Decl., ¶ 10. The TSA Administrator is required to provide for at least one law enforcement officer at each security screening location. 49 U.S.C. § 44901(h)(2).

---

[4] The Walker Declaration previously was filed in support of the United States' Motion to Dismiss Erway's prior lawsuit arising from the same events. See Kimberly Erway v. TSA, et al., No. 5:20-cv-141-M (E.D.N.C.), (DE 8-5). It is incorporated herein by reference. Fed. R. Civ. P. 10(c).

4

Airports separately are required to have an adequate number of local law enforcement personnel on site. See 49 U.S.C. § 44903(c)(1); 49 C.F.R. § 1542.215.

## FACTS AND PROCEDURAL BACKGROUND

Erway's claims arise from TSA security screening on May 1, 2019. On December 14, 2020, Erway presented an IIED claim on behalf of J.E. to TSA demanding $1 million dollars in damages. On August 23, 2021, Erway filed the Complaint.[5] (DE 1). The United States Attorney's Office was served on September 2, 2021. TSA and the United States move to dismiss Erway's claims pursuant to Rules 12(b)(1) and (b)(6).

Erway's minor daughter J.E. is a transgender individual who was assigned the male sex at birth but now lives as a female. (DE 1, ¶¶ 24–25). On May 1, 2019, Erway and J.E. arrived at the Raleigh-Durham International Airport (RDU) to board a flight. Id., ¶¶ 1, 15–16, 49 n.4. They presented themselves for security screening at a TSA checkpoint. After having their travel documents checked and divesting their carry-on property for x-ray screening, they were directed to enter an Advanced Imaging Technology (AIT) scanner to screen their bodies and clothing.[6] Id., ¶¶ 17–19. An AIT scanner requires an operator to indicate at the start of a scan whether the individual being scanned is male or female. Id., ¶¶ 26–27. Because J.E. presented as a female in her appearance and dress, consistent with her female gender identity, the TSA employee operating the AIT scanner indicated that J.E. was female to start her scan. Id., ¶¶ 24–25, 28.

---

[5] Erway appears to bring claims only on behalf of her minor daughter, not on her own behalf. The allegations suggest only J.E. was injured. See, e.g., (DE 1 at ¶ 69) (alleging that J.E. was unconstitutionally seized); id. at ¶ 74 (alleging that J.E. experienced emotional distress).
[6] AIT scanners utilize millimeter-length electromagnetic waves capable of detecting metallic and nonmetallic items carried on the body or in clothing. Passenger Screening Using Advanced Imaging Technology, 81 Fed. Reg. 11,364, 11,365 (2016) (final rule). A passenger undergoing AIT screening must step into the scanner and momentarily assume and hold a stance with arms overhead and feet set apart. See TSA Website, available at: https://www.tsa.gov/travel/security-screening.

5

J.E.'s AIT scan resulted in an alarm indicating the possible presence of an item being carried on her body or in her clothing in the groin area. Id., ¶ 20. Under TSA's standard operating procedures, further screening with a pat-down was required to resolve the AIT alarm and ensure that J.E. was not carrying any prohibited items or potential threats to transportation security. Id., ¶ 34.[7] The TSA employee operating the AIT scanner informed J.E. of the AIT alarm and the need for a pat-down, and J.E. replied that she is transgender and has male anatomy. Id., ¶ 31–34. J.E. suggested that the AIT alarm may have been caused by her male anatomy, and she asked to be rescanned as a male. Id., ¶¶ 31. The TSA employee declined J.E.'s request for a rescan and called for assistance from a supervisor. Id., ¶ 32–33.

According to the Complaint, TSA supervisor "Jane Doe" arrived at the checkpoint and told J.E. "that she would need to accompany [the supervisor] to a private room, expose herself, and allow [the supervisor] to 'feel up in there,' i.e., touch her genitals." Id., ¶ 36. When J.E. "verbally protested" that proposed search, the supervisor allegedly "advised [J.E.] that she would not be allowed to leave the checkpoint until she complied." Id., ¶¶ 37–38. Erway refused to direct J.E. to comply with the proposed search, and the TSA supervisor "summoned a police officer." Id., ¶¶ 43–44, 46. After the police officer "advised that he would not be assisting in the detention of J.E.," TSA permitted the Erways to return to the public side of the terminal without requiring J.E. to complete the screening process. Id., ¶¶ 47–49. Erway rented a car and drove them to their home. Id., ¶ 49. The facts are disputed.

---

[7] See also TSA Website, available at: https://www.tsa.gov/travel/security-screening ("Pat-down procedures are used to determine whether prohibited items or other threats to transportation security are concealed on the person. You may be required to undergo a pat-down if the screening technology alarms[.]").

**ARGUMENT**

**I.     STANDARD OF REVIEW**

> A.     <u>Rule 12(b)(1): Dismissal for Lack of Subject-Matter Jurisdiction</u>.

A motion filed under Rule 12(b)(1) challenges a court's jurisdiction over the subject of the dispute and questions the "very power" of the court to hear the case. <u>United States v. Beasley</u>, 495 F.3d 142, 147 (4th Cir. 2007). Federal courts are courts of limited jurisdiction and are empowered to act on claims against the United States only in those specific instances in which the Constitution or a statute unequivocally waives the federal government's sovereign immunity from suit. <u>Lane v. Pena</u>, 518 U.S. 187, 192 (1996). The plaintiff bears the burden to demonstrate the existence of subject-matter jurisdiction. <u>Smith v. Wash. Metro. Area Transit Auth.</u>, 290 F.3d 201, 205 (4th Cir. 2002). When a defendant challenges the factual basis for subject-matter jurisdiction, the court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the motion into one for summary judgment. <u>Evans v. B.F. Perkins Co.</u>, 166 F.3d 642, 647 (4th Cir. 1999).

> B.     <u>Rule 12(b)(6): Dismissal for Failure to State a Claim</u>.

When considering a motion to dismiss under Rule 12(b)(6), "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." <u>Mylan Labs., Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993). A complaint must state a claim for relief that is facially plausible. <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007). Facial plausibility means that the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged," as merely reciting the elements of a cause of action with the support of conclusory statements does not suffice. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). The Court need not accept the plaintiff's legal

7

conclusions, unwarranted inferences, unreasonable conclusions, or arguments. <u>Philips v. Pitt County Mem. Hosp.</u>, 572 F.3d 176, 180 (4th Cir. 2009).

## II. THE COURT LACKS JURISDICTION OVER THE IIED CLAIM BECAUSE IT IS BARRED BY THE FTCA'S INTENTIONAL TORTS EXCEPTION.

Although Erway labels her claim as "IIED," it arises out of, and indeed depends on, factual allegations of false imprisonment. <u>See</u> (DE 1, ¶¶ 61–65). The intentional torts exception (ITE) to the FTCA excludes from the statute's waiver of sovereign immunity claims arising out of false imprisonment. 28 U.S.C. § 2680(h). An exception to the ITE, the law enforcement proviso, waives sovereign immunity for claims based on the conduct of investigative or law enforcement officers. That exception does not save Erway's claim. The plain text and the legislative history of the law enforcement proviso confirm that it applies only to intentional torts committed by traditional investigative or law enforcement officers, <u>not</u> by TSA security screeners conducting administrative searches. Last, even if a contrary construction were plausible, any ambiguity should be construed narrowly because Congress did not clearly signal an intent to waive sovereign immunity for claims of intentional torts such as false imprisonment arising out of TSA screeners' typical daily search of over two million passengers and crew.[8] Therefore, the IIED claim should be dismissed for lack of subject-matter jurisdiction under 28 U.S.C. § 2680(h).

A. The IIED claim arises out of allegations of false imprisonment.

The intentional tort exception set forth in 28 U.S.C. § 2680(h) bars not only claims for the expressly listed torts—e.g., "false imprisonment"—but also <u>any</u> claim arising out of alleged conduct constituting those torts. <u>United States v. Shearer</u>, 473 U.S. 52, 55 (1985)

---

[8] Prior to the COVID-19 pandemic, TSA screened an average of between 2 to 2.5 million individuals per day. In recent months, TSA has once again regularly screened more than 2 million individuals per day. <u>See</u> TSA Website, available at: https://www.tsa.gov/news/press/releases/2021/06/12/tsa-surpasses-2-million-daily-travelers-screened; <em>id.</em>, available at: https://www.tsa.gov/coronavirus/passenger-throughput.

("Section 2680(h) does not merely bar claims <u>for</u> assault and battery; in sweeping language it excludes any claim <u>arising out of</u> assault or battery."); <u>Al Shimari v. CACI Int'l, Inc.</u>, 679 F.3d 205, 236 (4th Cir. 2012); <u>Harms v. United States</u>, 972 F.2d 339, 1992 WL 203942, at *4-5 (4th Cir. Aug. 24, 1992) (unpublished table decision) (holding that even though IIED claim was not "expressly barred by section 2680(h)," it was "dependent upon" allegations of conduct constituting the expressly listed intentional torts of libel and slander). Thus, regardless of how a plaintiff chooses to label a claim, the claim is barred if it is fundamentally predicated on alleged conduct that is essential to one of the torts listed in the ITE. <u>Popovic v. United States</u>, 175 F.3d 1015, 1999 WL 228243, at *3 (4th Cir. Apr. 20, 1999) (unpublished table decision) ("It is well settled that the form of the tort does not control; we must look to the substance of the conduct of which the plaintiff complains." (citations omitted)).

Here, although Erway pled her FTCA claim as IIED, the claim depends on factual allegations constituting the intentional tort of false imprisonment. Erway alleged that J.E. suffered emotional distress when a TSA supervisor "intentionally detained" J.E. without J.E.'s "consent to confinement" and told J.E. "that she would not be allowed to leave . . . until she complied" with the supervisor's direction to submit to a pat-down search. (DE 1, ¶¶ 38–39, 65–67). Erway further alleges that such confinement was "unlawful." <u>Id.</u>, ¶ 68. The essential substance of these factual allegations is a claim for false imprisonment. <u>See, e.g.</u>, <u>Johnson v. City of Fayetteville</u>, 91 F. Supp. 3d 775, 815 (E.D.N.C. 2015) ("Under North Carolina law, false imprisonment is the 'illegal restraint of a person against his will' and 'restraint is illegal if it is unlawful or [without consent].'" (quoting <u>Moore v. Evans</u>,476 S.E. 2d 415, 421 (N.C. Ct. App. 1996))). Indeed, Erway relies on the same allegations to plead a Fourth Amendment claim for unreasonable seizure. (DE 1, ¶¶ 57–69); <u>see</u> <u>Bailey v. Kennedy</u>, 349 F.3d 731, 742 (4th Cir. 2003) (noting that North Carolina state law tort claim of false imprisonment was "intertwined with [plaintiff]'s Fourth Amendment unlawful seizure

9

claim"). It is clear that the gravamen of Erway's Complaint is the assertion that J.E. was harmed by being unlawfully detained against her will for a period of time before she was permitted to leave the checkpoint without completing the screening process or submitting to any physical search procedures. "No semantical recasting of events can alter the fact that" the allegedly unlawful, nonconsensual detention was the essential cause of the claimed injury to J.E. and therefore the true basis of the FTCA claim in this action. Shearer, 473 U.S. at 55. Erway "cannot avoid the reach of § 2680(h) by framing" in different terms what is at bottom a claim predicated on allegations of the expressly barred tort of false imprisonment. Id.

Because Erway's IIED claim arises out of an alleged false imprisonment—a tort listed in 28 U.S.C. § 2680(h)—the Court lacks subject-matter jurisdiction to hear the claim unless it is based on the alleged conduct of an investigative or law enforcement officer. As explained below, TSA screeners like the "Jane Doe" named in the Complaint are not investigative or law enforcement officers within the meaning of the FTCA's law enforcement proviso. Accordingly, the Court should dismiss the IIED claim pursuant to Rule 12(b)(1).

B.    The plain language of the law enforcement proviso shows that TSA security screeners are not "investigative or law enforcement officers."

In applying the FTCA's law enforcement proviso, the Court must "look to the particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988).  Statutory terms should not be construed "in a vacuum, but with reference to the statutory context, structure, history, and purpose." Abramski v. United States, 573 U.S. 169, 179 (2014). Here, there are multiple indicators in the statutory text that show it is intended to apply only to traditional law enforcement officers empowered to investigate and respond to suspected criminal conduct.

First, Congress limited the proviso to "investigative or law enforcement officers," rather than "employees." Elsewhere in 28 U.S.C. § 2680, in contrast, Congress created

10

exceptions to the FTCA's waiver of sovereign immunity for certain claims arising out of the "act or omission of an employee of the Government." 28 U.S.C. § 2680(a), (e). Where Congress uses certain language in one statutory provision but not another, that choice should be given significance. See Loughrin v. United States, 573 U.S. 351, 358 (2014). And Congress's use of "investigative or law enforcement officer" in the proviso carries further significance, as Congress used that same phrase elsewhere in the U.S. Code to describe individuals authorized by law to perform traditional criminal law enforcement functions. See, e.g., 18 U.S.C. § 2510(7) (describing an officer "empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses"); 50 U.S.C. § 1809 (criminalizing electronic surveillance under color of law, but establishing the defense "that the defendant was a law enforcement or investigative officer engaged in the course of his official duties and the electronic surveillance was authorized by and conducted pursuant to a search warrant or court order").

Second, Congress expressly defined "investigative or law enforcement officer" to mean an officer "empowered by law to execute searches, to seize evidence or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). Even viewed in isolation, the authority to "execute searches" naturally connotes the traditional police power to execute a warrant or other type of criminal search, such as a search incident to arrest. See, e.g., United States v. Ramirez, 523 U.S. 65, 69 (1998) ("[A]pproximately 45 officers gathered to execute the [search] warrant."); Los Angeles County v. Rettele, 550 U.S. 609, 614 (2007) ("In executing a search warrant officers may take reasonable action to secure the premises."). Notably, Congress used the term "execute" rather than more general language such as "conduct" or "carry out." In contrast, where Congress has described administrative searches of the type carried out by TSA screeners—searches conducted without individualized suspicion for a particular purpose

11

other than criminal investigation—it has typically used terms such as "screening" or "inspection." See 29 U.S.C. § 657(a)(2) (OSHA inspectors may "inspect and investigate"); 21 U.S.C. § 374(a)(1) (FDA inspectors may "enter" and inspect"); 42 U.S.C. § 6927(a) (authorizing EPA inspectors "to enter" and "to inspect").

Third, the other listed powers in the proviso's definition of investigative or law enforcement officer—to "seize evidence" and "to make arrests"—confirm that "execute searches" should be read narrowly. Those powers are quintessential police powers. Under the interpretive principle that words in a list should be read together and given a related meaning—i.e., that a "word is known by the company it keeps"—"seize evidence" and "make arrests" suggest that "execute searches" should be read to be limited to traditional law enforcement searches. See Dolan v. U.S. Post. Serv., 546 U.S. 481, 486–87 (2006). In Dolan, the Supreme Court, in interpreting the statutory exception to the FTCA's waiver of sovereign immunity for claims "arising out of the loss, miscarriage, or negligent transmission of letters or postal matter," 28 U.S.C. § 2680(b), refused to consider the phrase "negligent transmission" "in isolation * * * [to] embrace a wide range of negligent acts committed by the Postal Service in the course of delivering mail," instead reading it in relation to "loss" and "miscarriage" as limited to "negligence causing mail to be lost or to arrive late, in damaged condition, or at the wrong address." Id. at 486. A similar analysis applies here, and supports an interpretation of "execute searches" to mean only traditional criminal law enforcement searches. See, e.g., Weinraub v. United States, 927 F. Supp. 2d 258, 262 (E.D.N.C. 2012) ("[T]he phrase 'to execute searches,' when considered within the broader context of the law enforcement proviso, does not contemplate the type of searches performed by TSA screeners.").[9]

---

[9] The Fourth Circuit has not addressed the application of 28 U.S.C. § 2680(h) to TSA's screening workforce. The Weinraub decision issued by Judge Flanagan in this District is the

Fourth, the list of duties carried out by "investigative or law enforcement officers"—"to execute searches, to seize evidence, or to make arrests"—is further qualified by the requirement that the search, seizure, or arrest is "for violations of Federal law." An investigative or law enforcement officer may only make an arrest for a violation of federal law that is criminal in nature. That plain meaning should inform the construction of the first two items of the list to similarly refer to traditional criminal law enforcement. Furthermore, the phrase "for violations of Federal law" is best read to apply to all three similar items in the integrated list. See Clark v. Martinez, 543 U.S. 371, 378 (2005) (a phrase that "applies without differentiation to all three categories" retains the same meaning when modifying each category). The security screenings carried out by TSA screeners are not for the purpose of determining whether a violation of federal law has been committed or gathering evidence of such a violation. See Pellegrino, 937 F.3d at 184 (Krause, J., dissenting) ("[S]uch suspicionless screenings are not implemented to gather evidence of a crime with an eye toward criminal prosecution[.]"); Walker Decl., ¶ 9 ("[N]o TSA screener at RDU is authorized to . . . execute a criminal investigative search.").[10] Rather, an airport screening is an administrative search that is carried out without the need for individualized suspicion or probable cause. See, e.g., Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 675 n.3 (1989); Aukai, 497 F.3d at 960 (explaining that "airport screening searches . . . are conducted

---

only case from within the Fourth Circuit addressing the issue. This Court should follow Weinraub and hold that TSA screeners are not investigative or law enforcement officers.

[10] In ruling on a motion to dismiss for lack of subject-matter jurisdiction, the Court may properly consider affidavits and evidence such as official job descriptions to determine whether particular federal employees are investigative or law enforcement officers under § 2680(h). See, e.g., Evans, 166 F.3d at 647; Carrero v. Farrelly, No. 16-cv-3939, 2018 WL 1761957, at *5 n.2 (D. Md. Apr. 12, 2018) (explaining that consideration of extrinsic evidence was appropriate in determining whether an ICE employee who entered information into the National Crime Information Center database was an investigate or law enforcement officer); Chisholm v. United States, No. 08-cv-4149, 2009 WL 10710968, at *2-3 (D.S.C. Nov. 10, 2009) (considering declaration explaining the scope of an employee's authority).

13

. . . in furtherance of an administrative purpose"). Indeed, aviation security screenings by TSA screeners would be unconstitutional if their primary purpose were to detect evidence of ordinary criminal wrongdoing.[11] See <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32, 41–43 (2000). The modifier "for violations of Federal law" should not be construed to mean criminal violations when modifying the power to make arrests, but to mean criminal *and civil* violations when modifying the power to execute searches.

Finally, it is notable that the specific intentional torts that are covered by the law enforcement proviso—assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution—are the types of torts typically committed by individuals with traditional police powers. Taken as a whole, the statutory language makes clear that the proviso is best understood to permit only claims arising out of the conduct of officers empowered with traditional criminal investigative and law enforcement functions.

C.    <u>The law enforcement proviso's legislative history confirms its narrow scope.</u>

Although the plain language of the law enforcement proviso is clear that Congress did not intend for it to apply to any federal employee conducting a search, that conclusion is also supported by its legislative history, which demonstrates that Congress intended to limit the proviso to federal law enforcement officers empowered to perform criminal investigatory duties.

The law enforcement proviso was enacted following a series of no-knock, warrantless searches of houses that federal and state narcotics officers mistakenly believed were locations for drug dealing. John C. Boger, Mark Gitenstein & Paul R. Verkuil, *The Federal Tort Claims*

_____

[11] TSA screeners must call for assistance from law enforcement officers whenever they believe there may be a need to investigative or criminal enforcement intervention. Walker Decl., ¶ 10. Nor do TSA screeners investigate whether their discovery of a prohibited item amounts to a civil regulatory violation; such discoveries are referred to a separate class of TSA employees: Transportation Security Inspectors. <u>Id.</u>, ¶ 11.

Act Intentional Torts Amendment: An Interpretative Analysis, 54 N.C. L. Rev. 497, 500 (1976). The occupants testified before Congress that plain-clothed officers broke into their homes, pointed guns at them, and caused extensive damage. Id. at 500–501, 500 n.7. The press reported that the same law enforcement officers had been involved in earlier, mistaken searches that had caused substantial injury. Id. at 502–03. Following hearings, Congress enacted the law enforcement proviso in its current form.

Before enacting the proviso, Congress considered three separate bills that would have amended the broad immunity conferred by the FTCA's intentional tort exception. Two of the bills waived sovereign immunity for torts committed by all federal employees. See 54 N.C. L. Rev. at 510–17. The bill that became the law enforcement proviso, in contrast, was limited to torts committed by "investigative or law enforcement officers." Members of Congress and the Executive Branch repeatedly noted that the proviso bill "only applies to law enforcement officers. It does not apply to any other Federal employees that might violate the rights of an individual." 120 Cong. Rec. 5287 (statements of Reps. Donohue and Wiggins); see also Federal Tort Claims Amendments: Hearings on H.R. 10439 Before the Subcomm. on Claims and Governmental Relations of the H. Judiciary Comm., 93d Cong. 18 (1974) (testimony of Irving Jaffe, Acting Assistant Att'y Gen.) ("We have Department of Agriculture investigators who go look at books and records. We have Defense Department auditors to look at books and records. . . . They are not law enforcement officers" under the definition in the bill enacted into law); Sen. Rep. No. 93-588 (1974) (the purpose of the law enforcement proviso was to provide a remedy for "innocent individuals who are subjected to raids of the type conducted in Collinsville, Illinois"). This history confirms that Congress did not intend the proviso to apply to every federal employee who might have authority to conduct some type of search, but rather intended the proviso to apply only to federal law enforcement officers empowered to perform criminal investigatory duties.

15

D.   The Aviation and Transportation Security Act confirms that TSA screeners are not empowered by law to execute searches, to seize evidence, or to arrest.

The law enforcement proviso requires that an "officer" must be "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal Law." 28 U.S.C. § 2680(h). Determining whether the proviso applies, therefore, requires examining the powers granted by law to the officer. See Millbrook, 569 U.S. at 56. Here, the relevant laws governing aviation security screening make clear that TSA screeners are not granted the powers listed in § 2680(h)—in sharp distinction from a separate class of law enforcement officers who are.

The ATSA directs the TSA Administrator to "provide for the screening of all passengers and property." 49 U.S.C. § 44901(a). The TSA Administrator performs that function by hiring and training "security screening personnel," id. § 114(e) (or by entering into a contract with a qualified private security company, id. §§ 44901(a), 44920). But the ATSA does not grant those screening personnel any law enforcement powers to execute searches, seize evidence, and make arrests.

In contrast, the TSA Administrator can designate a federal employee "to serve as a law enforcement officer." Id. § 114(p)(1). A designated law enforcement officer is then granted the "[p]owers" under § 114(p)(2) to "carry a firearm"; "make an arrest" for federal offenses; and "seek and execute warrants for arrest or seizure of evidence . . . upon probable cause that a violation has been committed." TSA law enforcement officers serve, for example, as federal air marshals, deployed undercover on aircraft to protect passengers and crew against the risk of criminal and terrorist violence. That is the type of "investigative or law enforcement officer" that Congress intended to come within the scope of the law enforcement proviso. TSA security screeners, in contrast, are not.

16

In light of ATSA's bifurcation of screening authority and law enforcement authority, this Court should follow others that have embraced the commonsense understanding that the scope of the phrase "investigative or law enforcement officer" is meant to include only "the likes of FBI agents, Bureau of Prisons officers, postal inspectors, and [immigration enforcement] agents, all of which" perform "traditional law enforcement functions" and have "broad search, seizure, and/or arrest powers that they may exercise in a variety of circumstances." Weinraub, 927 F. Supp. 2d at 262–63; see also Pellegrino, 937 F.3d at 198–99 (Krause, J., dissenting). Unlike the law enforcement officers whose abusive conduct triggered enactment of the law enforcement proviso, TSA screeners do not conduct criminal investigations, search homes, or have weapons to draw. They are not authorized to exert force in furtherance of TSA's screening mission,[12] and they perform their duties only at designated airport checkpoints where individuals are subject to an administrative search because they have chosen to enter the sterile area of the airport. See Corbett v. TSA, 767 F.3d 1171, 1182 (11th Cir. 2014) ("Airport screening is a permissible administrative search; security officers search all passengers, abuse is unlikely because of its public nature, and passengers elect to travel by air knowing that they must undergo a search.").

E.    Any ambiguity regarding the scope of the law enforcement proviso should be resolved narrowly in favor of sovereign immunity.

Finally, even if it were possible to read the language in the proviso in isolation, and out of context, to cover every federal employee who might be empowered to carry out some type of search, that should not be a sufficient basis to abrogate the United States' sovereign immunity in the absence of a clear statement that Congress intended such a result. A congressional waiver of sovereign immunity is strictly construed in favor of the government,

---

[12] TSA does not, however, prohibit TSA screeners from defending themselves or others in order to stop a physical assault. Walker Decl., ¶ 10.

and "[a]ny ambiguities in the statutory language are to be construed in favor of immunity." FAA v. Cooper, 566 U.S. 284, 290–91 (2012).

Adhering to that axiom is especially important in the factual context in which Erway's claim arises. Airport screening necessarily involves intentional conduct by TSA screeners that an airline passenger might find objectionable. For example, screeners may intentionally instruct a passenger to remain standing in a particular area of the checkpoint until a screening procedure can be completed. In addition, screening may entail a certain degree of intentional physical contact in order to ensure that no security threat is present. Under the FTCA, a passenger may bring a claim for up to two years after a security screening experience (long after the typical period in which video of that screening is typically retained, see Walker Decl., ¶ 12). Given that TSA screeners typically interact with more than two million passengers per day, Walker Decl., ¶ 5, opening the FTCA to such an expansive new realm of interaction entails substantial resource allocation issues that Congress is best positioned to address in the first instance.

F.  The better-reasoned decisions by other courts support the conclusion that TSA screeners are not "investigative or law enforcement officers" within the meaning of the law enforcement proviso.

As shown above, the text, context, and history of the law enforcement proviso demonstrate that it does not apply to TSA employees conducting airport security screening. Although courts have not reached uniform results on this issue, the better-reasoned and more persuasive authority supports the conclusion that TSA screeners are not "investigative or law enforcement officers" for purposes of 28 U.S.C. § 2680(h).

The first court of appeals to reach the question, the Eleventh Circuit, concluded unanimously that TSA screeners do not qualify as law enforcement officers for the purposes of the FTCA's law enforcement proviso. See Corbett v. TSA, 568 F. App'x 690, 700–02 (11th Cir. 2014), cert. denied, 135 S. Ct. 1559 (2015). The Eleventh Circuit reasoned that TSA

18

screeners "are not 'officers of the United States Government,' as required by § 2680(h)'s statutory language." Id. at 701. The Court pointed to the distinction drawn in the FTCA between an "employee" of the federal government and an "officer of the United States," and reasoned that "[t]his variation in language is not insignificant." Id. The Court further emphasized that "the federal statutes governing airport security screening differentiate between federal employees of TSA and law enforcement officers," and that only the latter are the types of officers covered by § 2680(h). Id. (comparing 49 U.S.C. § 44901, which provides that "screening . . . shall be carried out by a Federal Government employee," with 49 U.S.C. § 114(p), which empowers the TSA Administrator to designate employees as "law enforcement officers" with the authority to carry a firearm, make arrests, and seek and execute search and arrest warrants").

Although a divided en banc Third Circuit reached the opposite conclusion in Pellegrino v. United States, 937 F.3d 164 (3d Cir. 2019), the dissenting opinion in that case, authored by Judge Krause and joined by Judges Jordan, Hardiman, and Scirica, more completely and naturally harmonizes both the terms of the statute and the applicable case law. The dissenting judges exhaustively analyzed the language of the law enforcement proviso, viewed in light of the longstanding distinctions between investigatory law enforcement searches and administrative searches, as well as its legislative history. Id. at 182–96. The dissent also pointed to the sweeping ramifications of the majority's holding, which the dissenters concluded would naturally result in the waiver of sovereign immunity for all employees who perform administrative searches." Id. at 196–98. That majority opinion not only created a circuit split with the Eleventh Circuit, the dissent noted, but was at odds with the overwhelming weight of circuit authority involving other types of employees who did not

enforce federal criminal laws. Id. at 197–200.[13] As the dissent explained, the majority opinion "dissects the law enforcement proviso into individual words and isolated phrases—text without context—and picks the broadest conceivable definition of each word." Id. at 181. "That breathtaking expansion of the proviso is textually unsound, departs from other circuits, and contravenes the rule that waivers of sovereign immunity must be strictly construed in favor of the Government." Id. And even if the majority's interpretation of the law enforcement proviso was "plausible," that was insufficient to support the majority's ruling because "a waiver of sovereign immunity must be unequivocally expressed in statutory text, and any ambiguities in the statutory language are to be construed in favor of immunity." Id. (citation and internal quotation marks omitted).

Indeed, even the majority in Pellegrino sought to cabin the reach of its holding by distinguishing the screening conducted by TSA screeners from what it called "typical administrative searches," emphasizing the "physically intrusive and ubiquitous nature of TSA searches." Id. at 176. But as the dissenters correctly recognized, "this reading of the provision as limited to 'physical searches' [is not only] atextual, it is made out of whole cloth."

_____

[13] The dissent's analytical approach also is in keeping with how courts have understood and applied the proviso to a variety of federal employees who lack traditional criminal law enforcement authority. Courts have held that certain employees do not qualify as investigative or law enforcement officers despite being empowered to engage in activities constituting a Fourth Amendment search or seizure. See, e.g., Wilson v. United States, 959 F.2d 12, 15 (2d Cir. 1992) (federal parole officers); Martin v. United States, No. 15-cv-278, 2016 WL 4542289, at *4-6 (S.D. Cal. Aug. 31, 2016) (FAA operations inspector); Lorsch v. United States, No. 14-cv-2202, 2015 WL 6673464, at *11 (C.D. Cal. Oct. 29, 2015) (Veterinary Medical Officers and Animal Care Inspectors); Garrett's Worldwide Enters., LLC v. United States, No. 14-cv-2281, 2015 WL 11825762, at *5 (D. Kan. Mar. 16, 2015) (Department of Transportation inspectors who had badges and investigation powers); Chisholm, 2009 WL 1071096 (loss prevention associate at military base exchange who followed customer suspected of shoplifting and brought her back to the store to be questioned and searched); Robinson v. United States, No. 07-cv-1496, 2008 WL 11509485 (D. Md. Mar. 18, 2008) (workplace supervisor who searched subordinate's cubicle); Saratoga Sav. & Loan Ass'n v. Fed. Home Loan Bank of San Francisco, 724 F. Supp. 683, 689 (N.D. Cal. 1989) (Federal Savings and Loan Insurance Corporation examiners empowered to access and take documentary records from financial institutions for enforcement purposes).

Id. at 195. The better reading of the proviso is the one advanced by the Pellegrino dissenters, which is grounded in statutory text, context, and history. And consistent with that view, the overwhelming majority of the district courts that have decided this issue—including this Court in Judge Flanagan's ruling in Weinraub—have concluded that TSA screeners are not investigative or law enforcement officers for purposes of the FTCA.[14]

Most recently, a divided panel of the Eight Circuit followed the Pellegrino majority and held that "given the powers delegated to [TSA screeners] and the highly intrusive search techniques they are authorized to use, we find that they fall within the ordinary public meaning of the proviso's definition of *investigative or law enforcement officers*." Iverson v. United States, 973 F.3d 843, 854 (8th Cir. 2020). But again the dissenting opinion, authored by Judge Gruender, provides the more persuasive analysis. Agreeing with the Pellegrino dissenters and the weight of district court authority, Judge Gruender found that TSA screeners are not "investigative or law enforcement officers" within the meaning of the FTCA for several reasons: they are "specifically deemed 'employees' and not 'officers' in the relevant authorizing statute" and therefore "they are not 'officer[s] of the United States' as defined in the FTCA"; in context, "it is clear that the FTCA waives sovereign immunity only for intentional torts committed by officers who execute searches for violations of federal criminal law"; and "the closeness of this issue dictates that TSA screeners" must be deemed outside of the scope of the law enforcement proviso under the "general rule that waivers of sovereign

---

[14] See e.g., Frey v. Town of Jackson, No. 19-cv-50, (DE 89 at 47–48) (D. Wyo. Dec. 2, 2019); Gesty v. United States, 400 F. Supp. 3d 859 (D. Ariz.), aff'd on reconsideration, No. 18-cv-533, (DE 33) (D. Ariz. Oct. 23, 2019) (explaining that the intervening Pellegrino decision "does not change [this] Court's analysis or determination"); Hernandez v. United States, 34 F. Supp. 3d 1168 (D. Colo. 2014); Weinraub, 927 F. Supp. 2d 258.

immunity are construed in favor of the Government." 973 F.3d at 855–68 (Gruender, J., dissenting).[15]

In sum, TSA screeners who only conduct limited administrative searches for prohibited items on the person or in the property of airline passengers are not officers empowered to execute searches for violations of federal law within the meaning of the law enforcement proviso. Thus, Congress has not waived the United States' sovereign immunity for claims arising from the intentional torts listed in the proviso—including false imprisonment—committed by TSA screeners. Because Erway's IIED claim arises out of allegations of false imprisonment, the Court should dismiss the claim for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).

## III.    THE COURT LACKS JURISDICTION TO ISSUE AN INJUNCTION.

### A.  Erway lacks standing to seek prospective injunctive relief.

Erway asserts that the security screening of J.E. violated the Fourth Amendment, and she seeks "an order compelling TSA to enforce [the agency's] policies, e.g., via additional training, improved employment screening, better monitoring, etc."  (DE 1, ¶¶ 81, 85). Erway's request fails at the threshold because Erway lacks standing to seek a prospective injunctive relief on behalf of J.E. In particular, the Complaint does not plausibly plead facts establishing a real risk of future harm to J.E.  Lack of standing deprives the Court of subject-matter jurisdiction, and the request for an injunction should be dismissed under Rule 12(b)(1).  See City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983) ("It goes without saying

---

[15] The issue was also presented to the Second Circuit last year, but that court declined to resolve it, instead remanding to the district court for further fact discovery on whether the TSA employee at issue "was a screener or a law enforcement officer within the meaning of federal airport security laws."  Leytman v. United States, No. 18-3859, 2020 WL 1487681, at *2 (2d Cir. March 25, 2020). No such discovery is necessary here, as it is clear that the federal employee who allegedly committed IIED is a TSA screener who has not been designated to serve as a law enforcement officer. Walker Decl., ¶ 16.

that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy.").

The equitable remedy of prospective injunctive relief is unavailable absent a showing of an "immediate threat that the plaintiff will be wronged again." Id. at 111. A plaintiff therefore does not have standing to seek an injunction unless the complaint pleads sufficient facts to establish a "likelihood of substantial and immediate irreparable injury." O'Shea v. Littleton, 414 U.S. 488, 502 (1974). A speculative claim of future injury is insufficient. Lyons, 461 U.S. at 111. Indeed, the Supreme Court has "repeatedly reiterated that threatened injury must be certainly impending" and "allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l, 568 U.S. 398, 409 (2013) (quotations omitted).

Here, Erway has not pled any facts to establish that J.E. "is immediately in danger of sustaining some direct injury." Lyons, 461 U.S. at 102. Instead, Erway's request of injunction is predicated on nothing more than "conjecture" and "speculation" about what could hypothetically happen when J.E. is screened at TSA checkpoints in the future. Id. at 108. Erway alleged that J.E. was emotionally harmed in a single instance in the past when one TSA employee "intentionally" acted "in violation of TSA policy." (DE 1, ¶¶ 4, 65, 68). The alleged cause of that past harm was not TSA's screening procedures themselves, but the purported misconduct of just one individual employee who intentionally deviated from those procedures. Id. at ¶¶ 82 (alleging that if TSA's procedures were followed, J.E. would not have been harmed); 84 (pleading that the Erways "do not challenge [TSA] policies and do not seek to modify them in any way"); 35–36 (alleging that the TSA employee violated a rule that was "explicitly" stated in the agency's screening procedures). With regard to the future, Erway did not plead any factual allegations concerning the likelihood that J.E. will ever again be screened by the same employee or by any other TSA employee who would purposefully

23

deviate from prescribed screening procedures, which Erway admits are sufficient to prevent harm to J.E. Erway also did not allege that J.E. has ever before or since experienced a similar instance of misconduct by a TSA screener, or that there have ever been any other substantiated reports of a transgender passenger being told "to submit to a strip search" involving "direct contact with the genitals." Id. at ¶¶ 35, 71. In short, the Complaint pleads nothing more than one past incident of misbehavior by one individual who acted for "unknown" reasons. Id. at ¶ 36. There are simply no factual allegations suggesting a broader problem or indicating any risk of future harm.

In the absence of such allegations, Erway appears to base her request for prospective injunctive relief entirely on J.E.'s desire "to fly again" and the wholly unsupported assertion that transgender travelers generally face an "increased risk" of being asked to submit to a strip search by rogue TSA screeners. Id. at ¶¶ 56, 79. Such conclusory pleading is certainly not enough to state sufficient "odds" of a future injury to establish standing. Lyons, 461 U.S. at 108. Putting aside whether TSA employees have intentionally departed the agency's screening procedures with any frequency, "it is surely no more than speculation to assert . . . that [J.E. herself] will again be involved in one of those unfortunate instances." Id. Erway's subjective belief about "the likelihood of a recurrence of the allegedly unlawful conduct" J.E. experienced in the past is irrelevant; "[i]t is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." Id. at 107 n.8; see also Clapper, 568 U.S. at 418 (explaining that "subjective fear . . . does not give rise to standing"). The allegation that J.E.'s emotional distress "currently prevents" her from traveling by air, (DE 1, ¶ 56), is also irrelevant to the standing analysis. "The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury[.]" Lyons, 461 U.S. at 107 n.8; see also Beattie v. United

States, 949 F.2d 1092, 1094 (10th Cir. 1991) (explaining that "conclusory allegations of continuing injury and collateral consequences are not sufficient to keep [a] case alive").

Because the Complaint does not allege a concrete, immediate risk of future harm to J.E., Erway lacks standing to seek prospective injunctive relief and this request should be dismissed for lack of subject-matter jurisdiction. Fed. R. Civ. P. 1.

B.     The Court lacks subject-matter jurisdiction because adjudication would entail review of an order issued by the TSA Administrator.

Even if Erway had standing, this Court lacks subject-matter jurisdiction to hear her request for an injunction. Erway's request for injunctive relief in this context necessarily implicates review of TSA's Screening Checkpoint Standard Operating Procedures (SOP)—which constitute an order of the TSA Administrator—and such review can only be obtained in an appropriate Court of Appeals under 49 U.S.C. § 46110. This Court therefore lacks subject-matter jurisdiction to adjudicate the request for an injunction against TSA and the request should be dismissed pursuant to Rule 12(b)(1).

Under 49 U.S.C. § 46110, the Courts of Appeals have "exclusive jurisdiction" over claims involving review of a TSA "order."  TSA's policies and procedures for conducting passenger security screening are set forth in the SOP, which is an "order" within the meaning of the statute.  See, e.g., Blitz v. Napolitano, 700 F.3d 733, 736–37, 740 (4th Cir. 2012).[16] In this case, any equitable remedy that could be construed from Erway's allegations cannot be addressed without reviewing the TSA procedures applicable to the circumstances of J.E.'s screening. Because those procedures are set forth in the SOP, that review can only be obtained via a petition for review in an appropriate Court of Appeals under 49 U.S.C. § 46110.

---

[16] TSA's SOP is Sensitive Security Information ("SSI") that cannot be publicly disclosed. See 49 U.S.C. § 114(r); 49 C.F.R. § 1520.5(b)(9)(i); Blitz, 700 F.3d at 737 ("[T]he specifics of [TSA's checkpoint screening procedures constitute sensitive security information.").

Accordingly, this Court lacks subject-matter jurisdiction to enjoin the agency with regard to the SOP's contents or implementation. See id. at 743 (affirming district court ruling that § 46110 "deprived it of subject-matter jurisdiction" over a claim that implicated review of TSA's SOP).

Indeed, Section 46110 operates to bar Erway's request for injunction in this Court even though Erway asserts that she is not directly challenging the SOP. See (DE 1, ¶¶ 82–85) (alleging that there is no problem with TSA screening procedures and the Erways "do not seek to modify them in any way"). Under the "inescapable-intertwinement doctrine" applicable to Section 46110, the statute must be read to "give the courts of appeals [exclusive] jurisdiction over not only challenges to" TSA's screening policies and procedures set forth in the SOP, "but also any claims inescapably intertwined with the review of those" policies and procedures. Durso v. Napolitano, 795 F. Supp. 2d 63, 69 (D.D.C. 2011); see also Gilmore v. Gonzales, 435 F.3d at 1125, 1133 n.9 (9th Cir. 2006) (holding that "as-applied challenges" to TSA procedures that "arise out of the particular facts" of a passenger's screening experience are inescapably intertwined with a review of "the orders issued by TSA with respect to airport security" and thus "must be brought before the courts of appeals"); Corbett v. United States, 458 F. App'x 866, 871 (11th Cir. 2012) (holding that "Corbett cannot escape the jurisdictional limitations of § 46110 by claiming that he asserts a broad constitutional challenge" because such a challenge "is inextricably intertwined with the SOP"); Muir v. TSA, No. 20-cv-1280, 2021 WL 231733 (C.D. Ill. Jan. 22, 2021) (holding that 49 U.S.C. § 46110 deprived district court of subject-matter jurisdiction to adjudicate separately enumerated counts in complaint stating "requests for (1) a permanent injunction preventing Defendant TSA from unlawfully discriminating against him on the basis of his disability (Count XXI) and (2) a permanent injunction prohibiting the Federal Defendants [including TSA] from denying him the right to travel"). "A basic purpose" of the "inescapable intertwinement doctrine" is to prevent

26

plaintiffs from avoiding the jurisdictional requirement of Section 46110 "through creative pleading." Durso, 795 F. Supp. 2d at 70.

Here, however Erway's request for injunction is read, it cannot be adjudicated without evaluating the SOP. Erway asserts that TSA should be enjoined in some indeterminate manner because it somehow failed to prevent one of its employees, "Jane Doe," from violating the SOP and thereby violating the Fourth Amendment and committing IIED. Erway's request thus necessarily depends on the allegation that "Jane Doe" did not follow the SOP, or that the SOP is inadequate to prevent the injury complained of here. In order to adjudicate any claim that can be construed from Erway's allegations, this Court would have to review the SOP and determine whether Jane Doe's alleged conduct was in compliance with or contravention of the prescribed screening procedures. If the Court finds that Jane Doe's conduct was actually in accordance with the SOP, then Erway's allegations are in fact a direct challenge to the SOP itself. In any event, no matter how Erway's allegations in support of an injunction are construed, this Court's consideration of a request for an injunction would necessarily implicate detailed review of the SOP. See El Bey v. Hilton, No. 15-cv-3188, 2017 WL 3842596, at *5 (E.D.N.Y. Sep. 1, 2017) (explaining that whether a plaintiff "recognizes it or not," a claim seeking relief from application of a screening procedure at a TSA checkpoint "must take head on the SOP protocols" or, "[a]t a minimum," raise issues that are "inextricably intertwined with the SOP"). Erway's request for injunction thus is barred from being heard in this Court, and it should be dismissed for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).

## IV. ALTERNATIVELY, ERWAY'S REQUEST FOR INJUNCTIVE RELIEF SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.

Finally, even if the Court finds jurisdiction over the request for an injunction, the claim fails because the Complaint does not state a Fourth Amendment claim upon which

27

relief can be granted against TSA. Erway simply does not allege that any particular action, policy, practice, or decision attributable to TSA itself violated the Fourth Amendment or was otherwise unlawful. As explained above, the Complaint is quite clear that TSA's screening procedures comport with the Fourth Amendment, and J.E.'s rights were violated by the actions of an individual TSA employee who intentionally did not follow those procedures. Erway cannot state a claim directly under the Constitution against TSA based on the rogue actions of one agency employee. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."); Arnsberg v. United States, 757 F.2d 971, 974 (9th Cir. 1985) (holding that "the United States is not liable under the Fourth Amendment for unreasonable seizures committed by its agents").

Moreover, Erway does not even set forth a cogent theory of causation. There is no explanation as to how TSA contributed to causing the purported Fourth Amendment violation intentionally committed by Jane Doe, let alone a plausible theory supported by allegations of fact. Instead, Erway offers only vague speculation that something about the agency's operations—perhaps its "training" or maybe its "employment screening" or possibly its "monitoring" of employees at checkpoints—somehow caused or failed to prevent Jane Doe's misconduct. (DE 1, ¶ 85). Erway's request for relief is similarly nebulous, as she merely asks the Court to order "TSA to take the actions necessary to enforce its policies" without any indication of what those actions might be. Id. at ¶ 86. In dismissing Erway's prior attempt to seek an injunction against TSA, this Court clearly explained that a pleading that "leaves the court guessing as to what Plaintiff seeks and why" is too "speculative" to "survive a Rule 12(b)(6) challenge." No. 5:20-cv-141-M, (DE 17 at 11). The same reasoning applies here. Indeed, the bulk of Erway's request for an injunction in this case is a verbatim restatement of the very same claim that this Court dismissed in the prior case. Compare id. at ¶¶ 77–79,

28

81, with (DE 1, ¶¶ 82, 84–85).[17]  The Court again should dismiss Erway's request for an injunction pursuant to Rule 12(b)(6) for failure to state a claim.

## CONCLUSION

For the reasons stated above, the Court should dismiss for lack of subject-matter jurisdiction and failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), both Erway's FTCA claim against the United States and Erway's request for entry of an injunction against TSA.

Respectfully submitted this 1st day of November, 2021.

G. NORMAN ACKER, III
Acting United States Attorney


By: /s/ Sharon C. Wilson
SHARON C. WILSON
Attorney for Defendant
Wells Fargo Building
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4026
Facsimile: (919) 856-4821
N.C. Bar Number: 18435
Sharon.Wilson2@usdoj.gov

---

[17] The only meaningful difference between Erway's current and prior request for an injunction is that in this case Erway specified that she is seeking injunctive relief against TSA for a purported violation of the Fourth Amendment.  In the prior action, Erway merely asserted a freestanding request for an injunction untethered to any specific legal claim against the agency.  The Court correctly held that it did not have subject-matter jurisdiction over such a request.  See No. 5:20-cv-141-M, (DE 17 at 10-11) (explaining that Erway's request for injunction mentions neither the Constitution nor any tort" and "leaves the court guessing regarding Plaintiff's theory of what gives the court subject-matter jurisdiction"); see also Bruton v. FirstHealth of the Carolinas, Inc., No. 12-cv-253, 2012 WL 6986788, at *2 (M.D.N.C. Nov. 29, 2012) ("The law does not recognize a freestanding cause of action for 'injunctive relief.'").  While identification of a cognizable legal claim against TSA—violation of the Constitution—might have cured the jurisdictional defect in the prior suit, Erway made no effort to remedy the speculative pleading that rendered her prior request for injunction "unable to survive a Rule 12(b)(6) challenge." No. 5:20-cv-141-M, (DE 17 at 11).  Instead, Erway simply reasserted the exact same conjectures about how the agency could somehow be blamed for the misbehavior of an employee who intentionally violated procedures.

29

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this 1st day of November, 2021, served a copy of the foregoing upon the below-listed party or parties electronically using the CM/ECF system or by placing a copy of the same in the U.S. Mail, addressed as follows:

Jonathan Corbett
958 N. Western Avenue #765
Hollywood, CA 90029
Email: jon@corbettrights.com

Matthew Ryan Gambale
Osborn Gambale Beckley & Budd PLLC
3801 Lake Boone Trail, Suite 400
Raleigh, NC 27607
Email: matt@counselcarolina.com

BY: <u>/s/ Sharon C. Wilson</u>
SHARON C. WILSON
Assistant United States Attorney
Civil Division
Attorney for Defendant
Wells Fargo Building
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4026
Facsimile: (919) 856-4821
N.C. Bar Number: 18435
Sharon.Wilson2@usdoj.gov