IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil Action No.: 5:21-CV-00338-M

| | |
|---|---|
| JAMII ERWAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES TRANSPORTATION ) | ORDER |
| SECURITY ADMINISTRATION, ) | |
| UNITED STATES OF AMERICA, and ) | |
| JANE DOE, *an Employee of the United* ) | |
| *States Transportation Security* ) | |
| *Administration*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

This matter comes before the court on the Defendants' Motion to Dismiss for Lack of

Subject-Matter Jurisdiction and Failure to State a Claim [DE 8]. Defendants United States and

United States Transportation Security Administration (the "Government") seek an order

dismissing Counts Two and Three of the operative Complaint. Finding it lacks subject-matter

jurisdiction to hear these claims, the court grants the Government's motion.

## I.    Background

On April 6, 2020, the Plaintiff's mother, Kimberly Erway, filed an action in this court

alleging the same claims against the same Defendants on behalf of the Plaintiff, who, at that time,

was a minor. *See Erway v. United States*, No. 5:20-cv-00141-M (E.D.N.C. 2020). This court

granted the Government's motion to dismiss Ms. Erway's claims against the United States and the

Transportation Security Administration (TSA) finding it lacked subject-matter jurisdiction over

the Federal Tort Claims Act (FTCA) claim and the claim seeking injunctive relief under the Fourth

Amendment. *Id.* In addition, the court dismissed without prejudice the Fourth Amendment *Bivens* claim against Defendant Jane Doe ("Doe") for Ms. Erway's failure to serve Doe pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. *Id.* Based on the same set of facts, Plaintiff[1] here alleges the same claims: (1) unreasonable seizure under the Fourth Amendment against Doe; (2) intentional infliction of emotional distress pursuant to the FTCA against the United States; and (3) injunctive relief under the Fourth Amendment against the TSA. Compl., DE 1.

A.    Plaintiff's Statement of Facts

The following are relevant factual allegations (as opposed to statements of bare legal conclusions, unwarranted deductions of fact, or unreasonable inferences) made by the Plaintiff in the operative Complaint, which the court must accept as true at this stage of the proceedings pursuant to *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

On May 1, 2019, Plaintiff (a minor at the time) and Plaintiff's mother arrived at Raleigh Durham International Airport (RDU) with valid boarding passes for a flight leaving later that day. Compl., ¶¶ 15-25. They presented identification and their boarding passes to TSA. *Id.* Plaintiff, who identifies as transgender (a biological male who identifies as a female) stepped into the body scanner as requested. *Id.* The body scanner uses radiation to create a full-body scan of an individual and inspects for anomalies that are not part of the human body and could be a threat. *Id.* The operator must press a button on the scanner indicating either male or female to operate it effectively and for the scanner to know what to expect. *Id.* False positives occur when the scanner indicates an anomaly though a passenger is not secreting any items on their person. *Id.* ¶¶ 21-23.

---

[1] This case was also initiated by Ms. Erway on behalf of Plaintiff as a minor; however, on May 16, 2022, the court granted Plaintiff's motion to substitute for Plaintiff's mother because Plaintiff "recently celebrated her eighteenth birthday." DE 16.

When Plaintiff passed through the scanner, it indicated the presence of an anomaly in the groin area, even though Plaintiff did not possess any forbidden items. *Id.* ¶¶ 20-21. Plaintiff informed the scanner operator that the false positive could be resolved by re-scanning and pushing the male button, as the presence of male genitalia interferes with what the machine expects to find in a female scan. *Id.* ¶¶ 28-31. However, the operator declined to re-scan and called over a supervisor, Defendant Doe, to whom the operator explained the anomaly and Plaintiff's transgender identity. *Id.* ¶¶ 32-33. The TSA procedure to determine whether anomalies are false positives "is to conduct a brief pat-down search right next to the body scanner." *Id.* ¶ 34. Despite procedures explicitly forbidding checkpoint screeners from strip-searching and contacting travelers' genitals, Doe "advised [Plaintiff] that she would need to accompany her to a private room, expose herself, and allow [Doe] to 'feel up in there,' i.e., touch her genitals." *Id.* ¶¶ 35-36.

Plaintiff verbally protested, but Doe refused to allow Plaintiff to leave the checkpoint until Plaintiff complied with the search. *Id.* ¶ 38. Plaintiff's mother, who was several feet away, asked what was going on and Doe told her to "mind her business." *Id.* ¶¶ 40-41. However, once Plaintiff's mother asserted that Plaintiff was her minor child, Doe told her to force Plaintiff to submit to a strip search, which she refused to do. *Id.* ¶¶ 42-44.

Doe summoned a police officer who "advised that he would not be assisting in the detention" of Plaintiff. *Id.* ¶¶ 46-48. At that point, Plaintiff and Plaintiff's mother, without further protest from TSA, left the airport, rented a car, and drove to their home over 600 miles away. *Id.* ¶ 49. During the interaction with TSA, Plaintiff experienced symptoms of emotional distress, including "panic, anxiety, fear, racing heart, shortness of breath, uncontrollable shaking, and nausea." *Id.* ¶ 45. Plaintiff asserts that the symptoms have continued to persist every time Plaintiff is reminded of the incident. *Id.* ¶ 54.

3

B.    Procedural History

In the present motion, the Government argues that the court lacks subject-matter jurisdiction to adjudicate Count Two, because sovereign immunity has not been waived, and Count Three, because Plaintiff lacks standing.  Plaintiff counters that the tort alleged in Count Two does not arise from an intentional tort listed in the exception to FTCA waiver of sovereign immunity and, even if it does, the immunity is waived when, as here, the tortfeasor is an "investigative or law enforcement officer."  Plaintiff also contends that Plaintiff has standing to assert a claim for injunctive relief because Plaintiff alleges a future likelihood of encountering "abuse" from the TSA.  The Government replies that Plaintiff's FTCA claim necessarily arises from the intentional tort of false arrest/imprisonment based on the context of Plaintiff's allegations as a whole; the tortfeasor in this case, Doe, a TSA screener, was not an investigative or law enforcement officer within the statutory definition; and Plaintiff's allegations fail to demonstrate the "real and immediate threat of future harm" necessary to assert standing for a claim seeking injunctive relief.

## II.    Legal Standards

In seeking dismissal of Counts Two and Three, the Government cites Rule 12(b)(1)[2] of the Federal Rules of Civil Procedure asserting that this court lacks subject-matter jurisdiction to adjudicate the claims.  The Supreme Court instructs that

> [f]ederal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.  It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.

---

[2]Although Defendants' motion invokes both Rules 12(b)(1) and 12(b)(6), the court finds it lacks subject matter jurisdiction in this case and, therefore, will not proceed to address Defendants' Rule 12(b)(6) arguments.

4

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted); *see also Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004). "[T]he party who seeks the exercise of jurisdiction in his favor . . . must allege in his pleading the facts essential to show jurisdiction." *McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936); *see also Bowman v. White*, 388 F.2d 756, 760 (4th Cir. 1968) ("[T]he complaint must state on its face the grounds for its jurisdiction.").

A defendant may move for an order to dismiss a claim by arguing that the complaint fails to properly allege subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

> When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. The district court should grant the Rule 12(b)(1) motion to dismiss only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.

*Evans v. B. F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (internal quotation marks and citations omitted). Further, if a district court "determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action[,]" regardless of whether the relevant defendant against whom the claim was brought has moved the court seeking dismissal. Fed. R. Civ. P. 12(h)(3).

## III. Analysis

A. The United States has not waived sovereign immunity for the FTCA claim and, thus, the court lacks subject matter jurisdiction.

In Count Two, Plaintiff sues Defendant United States for emotional injury alleged to have been intentionally inflicted on Plaintiff ("IIED claim") when Doe required that Plaintiff submit to a groin inspection before proceeding to the gate. (DE 1 ¶¶ 35-36). "Absent a waiver, sovereign

immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer,* 510 U.S. 471, 475 (1994). The Fourth Circuit has said:

> The FTCA represents a limited congressional waiver of sovereign immunity for injury or loss caused by the negligent or wrongful act of a Government employee acting within the scope of his or her employment. The statute permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred.

*Medina v. United States,* 259 F.3d 220, 223 (4th Cir. 2001) (citing 28 U.S.C. § 1346(b)).

Because the FTCA functions as a waiver of sovereign immunity, and sovereign immunity waivers are strictly construed, claimants seeking to sue the federal government under the FTCA must bring their claims in strict compliance with the statute's terms. *Kokotis v. U.S. Postal Serv.,* 223 F.3d 275, 278 (4th Cir. 2000).

    i. The tort underlying the IIED claim is False Imprisonment which is barred by the Intentional Torts Exception to the FTCA under 28 U.S.C. § 2680(h).

The Intentional Torts Exception (ITE) to the FTCA bars claims for torts that are expressly listed therein, as well as "any claim arising out of" those torts. 28 U.S.C. § 2680(h). "[T]he form of the tort does not control"; instead, the court "must look to the substance of the conduct of which the plaintiff complains." *Popovic v. United States*, 175 F.3d 1015, 1999 WL 228243, at *3 (4th Cir. Apr. 20, 1999) (citing *United States v. Neustat*, 366 U.S. 696, 703 (1961) and *Kugel v. United States*, 947 F.2d 1504, 1506-07 (D.C. Cir. 1991)). A party cannot semantically recast the events to alter the basis for their claims. *See United States v. Shearer*, 473 U.S. 52, 55 (1985) (holding the FTCA "negligence" claim of the mother of an off-duty Army private for the murder of her son was barred by sovereign immunity because the claim arose from a "battery," which is excepted in § 2680(h)).

6

Here, Plaintiff alleges a claim of IIED, a tort not expressly included in the ITE. Compl. ¶¶ 21-23. Plaintiff asserts that the "mere threat of forcing one to submit to a strip search and manual manipulation of one's genitals, as Doe made to Jamii, when one wears the uniform of the United States of America and invokes that authority, and especially when the victim is a child, is sufficient to cause severe emotional distress in ordinary people." *Id.* at ¶ 71.

The Government counters that the claim actually arises out of an incident of false imprisonment—a tort the ITE bars. Mot. at 8. The Eleventh Circuit has addressed a claim similar to that presented here; in *Metz v. United States*, at the request of officials from the Federal Law Enforcement Training Center and the U.S. Department of the Treasury, the plaintiff was seized by Marine personnel and his car was searched shortly after arriving at a South Carolina military base. 788 F.2d 1528, 1530 (11th Cir. 1986). Arguing that the seizure of his person was ordered by government officials to intentionally inflict emotional distress, the plaintiff brought a claim of IIED in addition to his claims of false arrest and false imprisonment. *Id.* at 1532. The court held that the claim arose out of the incident of false arrest and was barred by § 2680(h). *Id.* at 1535. In its analysis, the Eleventh Circuit noted the Supreme Court's broad construction of "arising from" and its conclusion in *Block v. Neal* that a claim will be deemed to "'arise out of' an excepted cause of action when the underlying governmental conduct which constitutes an excepted cause of action is 'essential' to Plaintiff's claim." *Id.* at 1533-34 (*citing Block v. Neal*, 460 U.S. 289, 295 (1983)). The IIED claim in *Metz*, although it was a distinct cause of action, was predicated on Plaintiff's claim of false arrest, which is a tort included in the ITE. *Id.* at 1536. The Fourth Circuit adopted the Eleventh Circuit's *Metz* analysis in *Harms v. United States*, in which the court held that the IIED claims in question arose out of claims for libel and slander and, thus, were barred by the ITE. *Harms v. United States*, 972 F.2d 339, 1992 WL 203942, at *5 (4th

7

Cir. Aug. 24, 1992) (postmaster sued other postal workers under the FTCA for emotional distress caused by their alleged conduct).

Here, as in *Metz*, Plaintiff's claim arises out of Doe's conduct that constitutes Plaintiff's Fourth Amendment claim of unreasonable search and seizure in Count One. Unreasonable seizure is analogous to the common law tort of false imprisonment included in the ITE. *See* Restat. 2d of Torts, § 35; *see also Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001) (equating the essential nature of claims of false arrest and false imprisonment with a Fourth Amendment claim of unreasonable seizure). "Under North Carolina law, false imprisonment is 'the illegal restraint of a person against his will' and 'restraint is illegal if it is unlawful or [without consent].'" *Johnson v. City of Fayetteville*, 91 F. Supp. 3d 775, 815 (E.D.N.C. 2015) (quoting *Moore v. Evans*, 124 N.C. App. 35, 42, 476 S.E.2d 415, 421 (1996)).

Plaintiff argues that the basis for the IIED claim is not the illegal restraint of the Plaintiff but Doe's threat to strip search Plaintiff. However, without Plaintiff's belief that Plaintiff could not leave without submitting to the search, the threat of the strip search had no force or meaning. Like *Metz*, the governmental actions constituting the claim in Count One of unreasonable seizure (false imprisonment) are essential to Plaintiff's IIED claim, and the facts for each tort do not seem to be distinguishable.[3] As a result, the basis for the FTCA claim is the tort of false imprisonment

---

[3] In North Carolina, "[t]he essential elements of an action for intentional infliction of emotional distress are (1) extreme and outrageous conduct by the defendant (2) which is intended to and does in fact cause (3) severe emotional distress." *McClean v. Duke Univ.*, 376 F. Supp. 3d 585, 611 (M.D.N.C. 2019) (quoting *Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992)). Plaintiff contends that, as a "child," Plaintiff suffered "panic, anxiety, fear, racing heart, shortness of breath, uncontrollable shaking, and nausea" when Doe "threatened" to conduct a strip search of Plaintiff's genitals area. *See* Compl. ¶ 45; Resp. at 3. However, such "threat" would have no teeth if the Plaintiff were permitted simply to proceed to the gate. Further, the record of this case indicates that on May 11, 2022, Plaintiff notified the court that Plaintiff "recently celebrated her eighteenth birthday." DE 16. Thus, on May 1, 2019, the date of the incident at issue, Plaintiff was fifteen years old (or nearly that age). Plaintiff alleges that—unlike an intimidated child may be expected

and—Plaintiff's attempt notwithstanding—it cannot be recast as an IIED claim to avoid the ITE's bar. *Shearer*, 473 U.S. at 54.[4]

> ii. The Law Enforcement Proviso does not apply to TSA screeners because they are not law enforcement officers and perform only administrative searches.

Plaintiff contends that if the ITE applies, then the "law enforcement proviso," contained in § 2680(h), waives the sovereign immunity restored by the ITE. Resp. at 4. The proviso provides that, "For the purpose of this subsection, 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). Only three circuits have addressed the question of whether TSA screeners constitute law enforcement officers for purposes of the proviso. In *Corbett v. Transportation Security Administration*, the Eleventh Circuit held that TSA screeners are not officers under the proviso. 568 F. App'x 690, 701 (11th Cir. 2014), *cert. denied*, 575 U.S. 914 (2015).[5] Divided panels in the Third and Eighth Circuits held the opposite in *Pellegrino v. United States Transportation Security*

---

[4] to do—Plaintiff "verbally protested" when Doe told Plaintiff "to accompany her to a private room, expose herself, and allow Doe to 'feel up in there,' i.e., touch her genitals." Compl. ¶¶ 36-37. Moreover, Plaintiff alleges that before May 1, 2019, Plaintiff "typically flew by commercial aircraft several times per year" and, thus, was familiar with the TSA screening process. The court finds that, under these circumstances, the "threat" made by Doe to a fifteen-year-old frequent traveler would not cause actionable injury without Plaintiff's belief that Plaintiff could not leave the area before undergoing a strip search. *McClean*, 376 F. Supp. 3d at 612 (""The law does not provide a remedy for 'rough language, [or for] occasional acts that are definitely inconsiderate or unkind.'") (quoting *Hogan v. Forsyth Country Club. Co.*, 79 N.C. App. 483, 493, 340 S.E.2d 116, 123 (1986)). Accordingly, restraint against the Plaintiff's will is an essential element of the claim in Count Two.

[4] This conclusion does not conflict with the court's ruling that TSA screeners are not "investigative or law enforcement officers" under 28 U.S.C. § 2680(h). *See Benjamin v. Sparks*, 173 F. Supp. 3d 272, 291 (E.D.N.C. 2016), *aff'd*, 986 F.3d 332 (4th Cir. 2021) (addressing false imprisonment claims against private individuals).

[5] Unpublished opinions of the Eleventh Circuit, while not binding on that court, "may be cited as persuasive authority." 11th Cir. R. 36-2.

9

*Administration* and *Iverson v. United States,* respectively. 937 F.3d 164, 180 (3d Cir. 2019); 973

F.3d 843, 848 (8th Cir. 2020). The Fourth Circuit has not taken up the issue, and only one court

in the Eastern District of North Carolina has addressed the question. The Honorable Louise

W. Flanagan held that TSA screeners are not officers under the statute. *See Weinraub v. United

States*, 927 F. Supp. 2d 258, 266 (E.D.N.C. 2012). For the following reasons, this court agrees

with those courts finding that officers described in the proviso do not include TSA screeners.

> a. *The plain meaning of the statute indicates TSA screeners are employees,
> not officers.*

"The starting point for any issue of statutory interpretation . . . is the language of the

statute itself." *United States v. Bly*, 510 F.3d 453, 460 (4th Cir. 2007). The words of a statute,

however, should not be considered in isolation but must be interpreted in the broader context

of the remainder of the statute. *Dolan v. United States Postal Serv.*, 546 U.S. 481, 486 (2006).

Additionally, "courts must adhere to the ordinary meaning of phrases, not just the meaning of the

words in a phrase." *Iverson*, 973 F.3d at 855 (*quoting Bostock v. Clayton Cty.,* 590 U.S. 1731,

1834 (2020)).

Despite Plaintiff's original allegation in the Complaint that "TSA checkpoint employees

are not law enforcement officers and have no authority to detain anyone" (Compl. at 7, n.5),

Plaintiff now contends for jurisdictional purposes that TSA screeners fall within the proviso's

"investigative or law enforcement officers." The Government counters that the language and

design of § 2680(h) indicate that TSA screeners are not investigative or law enforcement officers.

Mot. at 10. The Government relies on the Eleventh Circuit's opinion in *Corbett*, and this court

finds *Corbett* persuasive.[6]

---

[6] The dissenting judges in *Pellegrino* and *Iverson* also found *Corbett* persuasive. *See Pellegrino*,
937 F.3d at 198 (Krause, J. dissenting); *Iverson*, 973 F.3d at 856 (Gruender, J. dissenting).

10

First, the FTCA distinguishes between a "federal employee" and an "officer of the United States." *Corbett*, 568 F. App'x at 701. The language in 28 U.S.C. § 1346(b)(1), to which § 2680(h) is an exception, waives immunity for the actions of "any *employee* of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1) (emphasis added). Later in the Act, Congress specifies that the law enforcement proviso applies to "any *officer* of the United States." 28 U.S.C. § 2680(h) (emphasis added). Furthermore, as referenced by the Government, the exception to the waiver of sovereign immunity a few provisions earlier in 28 U.S.C. § 2680(a) applies to claims arising out of "an act or omission of an *employee* of the Government." *Id.* (emphasis added). The court in *Corbett* found this difference in terms significant because it indicates that Congress intended the proviso to apply "only when the person, whose conduct is at issue, is an 'officer of the United States,'" which does not encompass all employees. *Corbett*, 568 F. App'x at 701.

The Aviation Transportation and Security Act (ATSA), which grants authority to TSA, also distinguishes between officers and employees. Section 44901(a) of the Act dictates that TSA shall provide "screening of all passengers and property," which shall be performed by a "Federal Government employee." Moreover, under 49 U.S.C. § 114(q), all TSA employees do not possess law enforcement powers. Instead, the statute gives the Administrator the power to "designate an employee of the Transportation Security Administration or other Federal agency to serve as a law enforcement officer." *Id.* At least one of these officers must be present at each airport screening location. 49 U.S.C. § 4490. As the Government notes, these officers are given the power to "'carry a firearm'; 'make an arrest' for federal offenses; and 'seek and execute warrants for arrest or seizure of evidence . . . upon probable cause that a violation has been committed.'" Mot. at 16 (citing 49 U.S.C. § 114(p)(2)).

11

Plaintiff contends that because § 2680(h) references "investigative or law enforcement officers," the "investigative or" extends the proviso to individuals who are not law enforcement officers. Resp. at 5. However, this ignores the fact that § 2680(h) defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). As laid out above, these powers to "seize evidence" and "make arrests" are not vested in TSA screeners—whom Congress specifically identifies as "employees"—but in the law enforcement officers designated by the Administrator. When read in the context of the entire Act, there is a distinction between the authority vested in the TSA screeners and that vested in TSA law enforcement officers. *See Leytman v. United States Dep't of Homeland Sec. Transp. Sec. Admin.*, 804 F. App'x 78, 81 (2d Cir. 2020) (citing the majority and dissenting opinions in *Pellegrino* and the opinion in *Corbett* and recognizing the difference between TSA screeners and TSA law enforcement officers). As the Government noted, this intentional line of demarcation should lead to a commonsense reading of "investigative or law enforcement officer" to constitute officers who perform "traditional law enforcement functions." Mot. at 17; *Weinraub*, 927 F. Supp. 2d at 262-63.

Nothing in the Complaint in this case indicates that the individuals involved, including Doe, were anything other than TSA screeners. Plaintiff's response brief, however, contains a photograph described as depicting a "uniform and badge of TSA screeners reading 'US Officer.'" Resp. at 5. The Government counters by referencing a declaration submitted in support of its motion to dismiss Ms. Erway's initial Complaint, filed in Case No. 5:20-cv-

12

00141-M at DE 8-5.[7] In it, Beth G. Walker, Federal Security Director (FSD) since January 2016 for the Raleigh-Durham International Airport (RDU), attests that the purpose of TSA screeners is to "screen[] [ ] passengers and property at airports to prevent weapons and explosives from being transported onto aircraft." *Id.* ¶ 5. Ms. Walker notes that the ATSA also "allows the TSA Administrator to designate a TSA employee to serve as a law enforcement officer authorized to carry a firearm, make arrests, and seize evidence" (*id.* ¶ 6); however, "no TSA screener at RDU has received a specific designation to serve as a law enforcement officer" and Ms. Walker has "never been aware of any TSA screener who has been designated by the TSA Administrator to serve as a law enforcement officer" (*id.* ¶¶ 6-7). Rather, the "need for law enforcement at TSA's airport security checkpoints is fulfilled by state, local, and private law enforcement officers"; at RDU, in particular, the "Airport Authority's Police Department, a fully-accredited North Carolina law enforcement agency, provides 24-hour local police presence at RDU." *Id.* ¶¶ 7-8. Ms. Walker concludes that "[b]ecause no TSA screener at RDU has been designated by the TSA Administrator to serve as a law enforcement officer, no TSA screener at RDU is authorized to carry a weapon, seize evidence, make arrests, or execute a criminal investigative search." *Id.* ¶ 9.

Plaintiff does not otherwise rebut Ms. Walker's testimony, presumably because Plaintiff attempts to distinguish TSA screeners as "investigative" rather than "law enforcement" officers.[8] However, as set forth above and described more fully below, the

---

[7] Both parties proffer evidence outside of the pleading to support their positions, and neither party seeks discovery or an order converting the motion to one for summary judgment. *See In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333-34 (4th Cir. 2014).

[8] Plaintiff cites the following testimony by Ms. Walker in support of Plaintiff's argument that TSA screeners are "investigative or law enforcement officers" because they "seize evidence": "If a TSA screener at RDU discovers an item that appears to be illegal contraband, such as child pornography or a controlled substance, the screener must call the RDU Police Department." No. 5:20-cv-

13

court finds unconvincing Plaintiff's contention that TSA screeners constitute non-law enforcement "investigative" officers under the statute. *See Nguyen v. United States*, 556 F.3d 1244, 1255–56 (11th Cir. 2009) (quoting the Senate Report on § 2680(h), which states: "The effect of this provision is to deprive the Federal Government of the defense of sovereign immunity in cases in which *Federal law enforcement agents*, acting within the scope of their employment, or under color of Federal law, commit any of the following torts: assault, battery, false imprisonment, false arrest, malicious prosecution, or abuse of process.") (citing 1974 U.S.C.C.A.N. at 2789-91) (emphasis added).

> b. *The word "searches" in the exception is limited to investigative searches and not the administrative searches performed by TSA.*

Plaintiff further argues that the searches TSA screeners are empowered to perform fall within the definition of "investigative or law enforcement officer" under the statute. Resp. at 5. In *Weinraub*, Judge Flanagan focused on whether the "limited, consensual searches conducted by TSA screeners" are enough to place them within the definition of "investigative or law enforcement officers." *Weinraub,* 927 F. Supp. 2d at 266. In holding that the limited nature of the searches was insufficient to bring them within the definition, Judge Flanagan identifies certain cases in which the Fourth Circuit found "broad investigative and law enforcement powers" possessed by Immigration and Naturalization Service agents and Postal Inspectors sufficient to render them within the proviso. *Id.* at 263 (citing *Medina v. United*

---

00141-M, DE 8-5, ¶ 10. The court finds Ms. Walker's testimony actually weakens Plaintiff's argument; Ms. Walker explains that it is the RDU police officer who is authorized to conduct a search, seize evidence, and/or make an arrest. *See id.* Further, Ms. Walker explains that, even if a screener discovers an item that is not illegal but is prohibited from entering the airport's secured area, the screener may not "seize" the item but rather "must give the item's owner the option of disposing of the item, leaving it with someone not entering the secure area, taking it back to his or her vehicle, or abandoning it." *Id.*

14

*States*, 259 F.3d 220, 224 (4th Cir. 2001) and *Harms*, 972 F.2d 339, 1992 WL 203942 at *6).

The powers in those cases are broader than the limited administrative search powers given to TSA screeners. *Id.* "[T]raditional investigative or law enforcement officers have broad search, seizure, and/or arrest powers that they may exercise in a variety of circumstances, which stands in stark contrast to the TSA screener's power that is limited to pre-boarding searches for certain prohibited items" most of which, as the Government points out, are lawfully possessed. *Id.*

Notably, the majority in *Pellegrino*, on which Plaintiff relies for Plaintiff's contention that TSA screeners have been empowered "to execute searches" consistent with § 2680(h), ignores the line of cases defining "search"; Judge Krause's dissent, however, details the history of that definition and the distinctions between the two types of searches—administrative and investigatory—that have been recognized by the Supreme Court and underlie Fourth Amendment jurisprudence. *See Pellegrino*, 937 F.3d at 183.

Investigatory searches are those that pertain "to criminal investigations, not routine, noncriminal procedures." *Id.* The primary purpose of administrative searches, however, is not "crime control" or "conducting criminal investigations." *Id.* Administrative searches first entered the law a few years before the FTCA and are typically distinguished from investigatory searches by being referenced as" 'inspections,' 'inspection searches,' 'regulatory searches' or 'administrative searches.'" *Id.* "TSA policies dictate that, "screenings 'be tailored to the transportation security purpose for which they are conducted' and forbid '[a]dministrative and special needs searches . . . to detect evidence of crimes unrelated to transportation security.'" *Id.* (quoting TSA Mgmt. Directive No. 100.4 ¶¶ 6.B(1), C(1)). Additionally, if a screener uncovers evidence of a crime, he or she "cannot seize the item, continue searching, or make an arrest,"

because only TSA law enforcement personnel are empowered to perform those actions. *Id*. Notably, in § 2680(h), while characterizing officers as "investigative" or "law enforcement," Congress did not include "administrative" searches in the definition. The doctrine of constitutional avoidance further counsels caution, as Fourth Amendment concerns are greater for law enforcement searches than for administrative searches.

Furthermore, an interpretation of the phrase in which the term "searches" appears reveals that Congress did not contemplate the inclusion of administrative searches. The canon of construction, *noscitur sociis*—a word is known by the company it keeps—is "wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Dolan*, 546 U.S. at 486 (quoting *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961)). Given the two types of searches the word "search" might reference, it is appropriate to consider the canon. The words listed alongside "to execute searches" are "to seize evidence or to make arrests for violations of Federal law," which are commonly listed "in tandem to describe police powers," supporting the idea that Congress intended to include only investigatory searches. 28 U.S.C. § 2680(h); *Pellegrino,* 937 F.3d at 187 (dissent).

Plaintiff contends that this canon should not be applied to the phrase at issue. Resp. at 8. However, Plaintiff's argument is not in line with the Supreme Court's interpretation in *Dolan*, in which the Court, interpreting another provision waiving sovereign immunity under the FTCA, applied the canon to a list similar to that in § 2680(h) and concluded that "negligent transmission" was limited by the terms "loss" and "miscarriage." 546 U.S. at 486 (interpreting "negligent transmission" in the context of "any claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter"). In the same way, reading "to execute

searches" in the context of the other two law enforcement powers limits "searches" to investigatory rather than administrative searches. That is, since "to seize evidence" and "to make arrests" refer to law enforcement powers not bestowed on TSA screeners, it would be odd if "to execute searches" swept more broadly to include the type of scanning conducted by the screeners. *See id.* at 487.

        c.   *Given the statutory construction, "in violation of Federal Law" modifies every item in the list.*

      As Plaintiff correctly points out (Resp. at 10), the last antecedent rule typically dictates that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 343 (2005) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). In *Jama*, the Supreme Court distinguished its conclusion that its statutory interpretation did not refute the last antecedent rule (since "[e]ach clause is distinct and ends with a period, strongly suggesting that each may be understood completely without reading any further") from previous cases where the phrase appeared "not in a structurally discrete statutory provision, but at the end of a single, integrated list" and the rule did not apply. *See id.* at 344, n.4 (citing *United States v. Bass*, 404 U.S. 336, 347 (1971) (ruling that, in a criminal statute providing that any person "who receives, possesses, or transports in commerce or affecting commerce any firearm," the phrase "in commerce or affecting commerce" applies to "possesses" and "receives" as well as to "transports.")). In referencing *Bass*, the Court confirmed it does not dispute that a word is known by its company when that idea is "in harmony" with the statutory construction. *Id.*

      Here, as outlined above, Plaintiff's application of the last antecedent rule to § 2680(h) is incorrect, because it is not in harmony with the statute's construction as a "single, integrated list." Following *Bass* and *Jama*, "for violations of Federal law" modifies not only "to make

arrests" but also "to execute searches" and "to seize evidence." Since it modifies "to make arrests," the phrase refers to violations of *criminal* law; thus, "to execute searches" and "to seize evidence" are also construed in the same context. *See Pellegrino*, 937 F.3d at 186 ("Otherwise, the phrase 'for violations of Federal law' would carry one meaning when modifying 'make arrests' yet another when modifying 'execute searches.' That cannot be.") (dissent).

Plaintiff argues that screeners' searches oftentimes uncover evidence of illegal activity and, thus, they act in a law enforcement capacity. However, as discussed above, TSA screeners are empowered to perform *administrative* searches, rather than searches for violations of federal criminal law—or, *investigatory* searches, which are covered under the exception. *Id.* In fact, the Supreme Court "ha[s] never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Id.* (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000)); *see also Ferguson v. City of Charleston*, 532 U.S. 67, 79, n.15 (2001) (an administrative search must advance an interest "divorced from the State's general interest in law enforcement"). Such a search may be rendered unconstitutional if its purpose extended beyond "programmatic purposes" to "law enforcement purposes." *Pellegrino*, 937 F.3d at 186 (citing *Edmond*, 531 U.S. at 37). Contrary to Plaintiff's argument, merely because a search may uncover evidence of a crime does not change its purpose and make it a search "for violations of Federal law." *See Whren v. United States*, 517 U.S. 806, 811 (1996).

For all of the reasons discussed, the court finds that TSA screeners are not investigative or law enforcement officers under the law enforcement proviso. Therefore, the Government's sovereign immunity has not been waived for Count Two.

18

B.  Plaintiff does not have standing to request an injunction against TSA, and as a result, the court does not have subject matter jurisdiction.

Count Three of the Complaint requests an injunction, compelling TSA to "take the actions necessary to enforce its policies to avoid future Fourth Amendment injury." Compl. ¶ 86. The Government seeks dismissal of Count Three both for the court's lack of jurisdiction and for Plaintiff's alleged failure to state a claim. As set forth above, the court must first address the Government's challenge to the court's jurisdiction to adjudicate this matter. *See Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019) ("…[C]ourts must always assure themselves of subject matter jurisdiction before reaching the merits, even if the parties have not raised it.").

Again, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Meyer*, 510 U.S. at 475. Further, "[t]he plaintiff bears the burden of persuasion if subject matter jurisdiction is challenged under Rule 12(b)(l) because the party who sues the United States bears the burden of pointing to an unequivocal waiver of immunity[.]" *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (internal quotation marks, ellipsis, and citations omitted); *see also Bowman*, 388 F.2d at 760 ("[T]he complaint must state on its face the grounds for its jurisdiction."). Plaintiff cites the Fourth Amendment as legal authority demonstrating a waiver of sovereign immunity that would allow the court to exercise subject-matter jurisdiction, pursuant to 28 U.S.C. § 1331, over Plaintiff's claim seeking injunctive relief against TSA. Compl. ¶ 77. The Government contends, however, that Plaintiff has no standing to bring the claim, and as a result, the court has no subject matter jurisdiction. Mot. at 22. The Plaintiff is correct that a claim of sovereign immunity would not shield the United States from a Fourth Amendment claim properly before the court if the plaintiff has standing; however, in this case, the Plaintiff does not have standing.

19

In *Los Angeles v. Lyons,* the Supreme Court specified "[t]hat those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." 461 U.S. 95, 101 (1983). Later, in *Lujan v. Defenders of Wildlife*, the Court went on to establish that there are three elements in the "irreducible constitutional minimum of standing."

> First, the plaintiff must have suffered an injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of–the injury has to be fairly…trace[able] to the challenged action of the defendant, and not…the result [of] the independent action of some third party not before the court. Third, it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision.

504 U.S. 555, 560-61 (1992) (internal citations and quotation marks mitted).

In *Lyons*, the plaintiff sought an injunction against the City of Los Angeles and four of its police officers barring the use of chokeholds. *Lyons,* 461 U.S. at 97-98. The officers allegedly stopped the plaintiff for a traffic code violation and ultimately put him in a chokehold despite his cooperation and without provocation, rendering him unconscious. *Id.* The Supreme Court held that the plaintiff did not have standing to seek an injunction because any claim of future injury was too speculative, as the plaintiff established no "real and immediate threat" that a Los Angeles police officer would again put him in a chokehold. *Id.* at 105-106. Imminence, as the Supreme Court expounded in *Clapper*, is "a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes— that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Despite Plaintiff's contention that there is a "substantial future likelihood" that Plaintiff will encounter TSA "abuse" in the future, Plaintiff does not offer evidence to support that conclusion. Reply at 13. Here, as in *Lyons*, Doe allegedly overstepped her authority; however,

20

while Doe's actions are alleged to have been inconsistent with TSA policies, the police officers in *Lyons* purportedly misapplied a common law enforcement technique. *See* Compl. ¶ 82; *Lyons,* 461 U.S. at 108-09. The facts in *Lyons* demonstrate it is even less likely that Plaintiff will encounter in the future a TSA screener threatening, contrary to TSA policy, that Plaintiff would need to strip and allow the agent to "touch [Plaintiff's] genitals" before allowing Plaintiff to proceed. For the same encounter to happen again, Plaintiff, having full knowledge of how scanners work, would have to fail to notify TSA of the proper biological button to push, set off another scanner, encounter a TSA screener who was not willing to re-scan when the circumstances were explained, then encounter either the same TSA screener or a supervisor who threatened Plaintiff and/or was bent on ignoring TSA policies. Like the chain of events needed to justify injunctive relief in *Lyons,* this is too speculative and does not present a real and immediate threat to Plaintiff. *See Lyons,* 461 U.S. at 105-06. Instead, there is no way to determine whether Plaintiff, who alleges that Plaintiff frequently experienced false positives prior to May 1, 2019, will reencounter the same or similar situation or, instead, will enjoy the seemingly positive experiences every other time Plaintiff has flown. *See* Compl. ¶¶ 1, 29.

As a result, Plaintiff does not have standing to bring the claim asserted in Count Three, and the court lacks subject matter jurisdiction to adjudicate the claim. Therefore, the court need not consider the Government's other arguments on subject matter jurisdiction. Additionally, because of the lack of jurisdiction, the court may not proceed to address the Government's Rule 12(b)(6) argument. *See Jordan*, 921 F.3d at 187 (requiring that courts address jurisdictional challenges before reaching other issues).

## IV.     Conclusion

In sum, the sovereign immunity the United States enjoys from suit has not been waived for Plaintiff's FTCA claim in Count Two, and the Plaintiff fails to demonstrate Article III standing to bring Count Three against TSA.  Therefore, the court lacks subject matter jurisdiction to adjudicate these claims, and the Government's motion to dismiss is GRANTED.  Counts Two and Three are DISMISSED WITHOUT PREJUDICE.

SO ORDERED this ____15th____ day of August, 2022.


_____
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE